1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Layne Friedrich (Bar No. 195431)
  layne@lawyersforcleanwater.com
Drevet Hunt (Bar No. 240487)
Lawyers For Clean Water, Inc.
1004A O'Reilly Avenue
San Francisco, California 94129
Telephone: (415) 440-6520
Facsimile: (415) 440-4155

Additional Counsel on Next Page

Attorneys for Plaintiffs Deltakeeper Chapter
of Baykeeper, Mother Lode Chapter of Sierra Club,
and Waterkeeper Alliance, Inc.

Eric E. Bronson - State Bar No. 110279
  eb@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
  NESSIM, DROOKS & LINCENBERG, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendants TAJ Silva Farms, LLC,
Joe M. Silva, and Antonio M. Silva

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

DELTAKEEPER CHAPTER OF BAYKEEPER, a
California non-profit corporation, MOTHER LODE
CHAPTER OF SIERRA CLUB, a California non-
profit corporation, and WATERKEEPER
ALLIANCE, INC., a New York not-for-profit
corporation,
                          Plaintiffs,
          v.

TAJ SILVA FARMS, LLC, a California limited
liability company, SILVA BROTHERS DAIRY,
INC., a California corporation, JOE M. SILVA, an
individual, and ANTONIO M. SILVA, an
individual,

                          Defendants.

Civil Case No.: CV 06-01452 DLB

**STIPULATION TO DISMISS
PLAINTIFFS' CLAIMS AGAINST TAJ
SILVA FARMS, LLC WITHOUT
PREJUDICE AND TO DISMISS
PLAINTIFFS' CLAIMS AGAINST JOE
M. SILVA, ANTONIO M. SILVA, AND
SILVA BROTHERS DAIRY, INC.
WITH PREJUDICE ; REQUEST FOR
DISTRICT COURT TO RETAIN
JURISDICTION TO ENFORCE
SETTLEMENT AGREEMENT;
and ORDER.**

1  CENTER ON RACE, POVERTY AND THE ENVIRONMENT
   Brent Newell (Bar No. 210312)
2  450 Geary Street, Suite 500
   San Francisco, CA 94102
3  Telephone: (415) 346-4179
   Facsimile: (415) 346-8723
4  Email: bjnewell@igc.org

5
   Attorney for Plaintiffs Deltakeeper Chapter
6  of Baykeeper, Mother Lode Chapter of Sierra Club,
   and Waterkeeper Alliance, Inc.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WHEREAS, the Deltakeeper Chapter of Baykeeper, Mother Lode Chapter of the Sierra Club, and Waterkeeper Alliance, Inc., (hereinafter collectively referred to as "Plaintiffs") and Joe M. Silva and Antonio M. Silva by and through their attorneys of record, hereby enter into this stipulation to dismiss with prejudice Plaintiffs' claims against Joe M. Silva, Antonio M. Silva and Silva Brothers Dairy Inc. as set forth in Case No. CV 06-01452 OWW (DLB) and to request the Honorable Dennis L. Beck, United States District Court Magistrate Judge, retain jurisdiction to enforce the terms of the settlement agreement, incorporated herein and attached hereto as Exhibit A;

WHEREAS, Joe M. Silva and Antonio M. Silva have used Silva Brothers Dairy, Inc. and Silva Brothers Dairy as the name(s) of the business entity that owns or operates the dairy operation at 12997 E. Peltier Road in Acampo, California ("Silva CAFO").  Currently, Joe M. Silva and Antonio M. Silva own or operate the Silva CAFO under the name Silva Brothers Dairy.  Accordingly, as an owner or operator of the Silva CAFO, Joe M. Silva and Tony M. Silva doing business as the Silva Brothers Dairy ("Silva Brothers Dairy"), hereby stipulate and agree to comply with the terms of the Settlement Agreement. ;

WHEREAS, Joe M. Silva and Antonio M. Silva own TAJ Silva Farms, LLC.  Documentary evidence filed with the Secretary of State provides that TAJ Silva Farms, LLC is involved in the business of farming at 12997 E. Peltier Road in Acampo, California.  Defendant TAJ Silva Farms, LLC admitted in its answer to the complaint that it was an owner or operator of the Silva CAFO.  TAJ Silva Farms, LLC has represented to Plaintiffs that the admission in the answer was a mistake and that TAJ Silva Farms, LLC does not own or operate the Silva CAFO.  In the interest of avoiding extensive discovery and to settle this action without further expense or delay, which all parties agree is in the parties' best interest, the parties stipulate to dismiss TAJ Silva Farms, LLC without prejudice.  Plaintiffs specifically reserve their right to refile the action against TAJ Silva Farms, LLC if Joe M. Silva, Antonio M. Silva, and Silva Brothers Dairy ("Silva CAFO Owners/Operators") cannot or will not adequately remedy a breach of the Settlement Agreement;

WHEREAS, on or about February 23, 2007, Plaintiffs and Silva CAFO Owners/Operators (collectively referred to as the "Settling Parties") entered into a settlement agreement ("Settlement Agreement"), which achieves a full and final settlement of all of Plaintiffs' claims;

WHEREAS, on or about February 23, 2007 the Settling Parties also filed their consent to proceed before Magistrate Judge Beck for all purposes;

WHEREAS, Plaintiffs and Joe M. Silva and Antonio M. Silva now enter into this stipulation to dismiss with prejudice Plaintiffs' claims against Joe M. Silva, Antonio M. Silva and Silva Brothers Dairy, Inc. and to request Judge Beck retain jurisdiction to enforce the terms of the Settlement Agreement;

NOW THEREFORE, the Settling Parties and TAJ Silva Farms, LLC jointly stipulate as follows:

1.      Plaintiffs' claims against Joe M. Silva, Antonio M. Silva, and Silva Brothers Dairy, Inc., as set forth in Case No. CV 06-01452 OWW (DLB), are hereby dismissed with prejudice.  The Settling Parties specifically agree that there is no prevailing party or substantially prevailing party, whether under 33 U.S.C. §1365(d), 28 U.S.C. §2412(d) or any other statute or law and that, except as set forth in the Settlement Agreement, each party shall bear its own attorneys' fees and costs.

2.      Plaintiffs' claims against TAJ Silva Farms, LLC, as set forth in Case No. CV 06-01452 OWW (DLB), are hereby dismissed without prejudice.

3.      The Settling Parties respectfully request that the Honorable Dennis L. Beck retain jurisdiction over Case No. CV 06-01452 OWW (DLB) for the purpose of resolving any disputes between the Settling Parties with respect to enforcement of any provision of the terms of the Settlement Agreement.

Dated: _____, 2007

_____          _____
By:     Layne Friedrich                                      By:     Eric Bronson
        Lawyers For Clean Water, Inc.                              Bird/Marella
        Attorneys for Plaintiffs                                  Attorneys for Defendants

//

//

//

//

1

**ORDER**

2      Good cause appearing, and based on the stipulation of the parties,

3      IT IS HEREBY ORDERED that Plaintiffs' claims against Joe M. Silva, Antonio M. Silva, and

4  Silva Brothers Dairy, Inc., as set forth in Case No. CV 06-01452 OWW (DLB), are hereby dismissed

5  with prejudice.

6      IT IS FURTHER ORDERED that Plaintiffs' claims against TAJ Silva Farms, LLC, as set forth

7  in Case No, CV 06-01452 OWW (DLB), are hereby dismissed without prejudice.

8      IT IS FURTHER ORDERED that this Court shall retain jurisdiction over Case No. CV 06-01452

9  OWW (DLB) for the purpose of resolving any disputes between the parties with respect to enforcement

10  of any provision of the terms of the Settlement Agreement.

11

12  IT IS SO ORDERED.

13

14  Dated: April 23, 2007

15

16

17      _____/s/ **Dennis L. Beck**_____

18               Magistrate Judge Dennis L. Beck
                 United States District Court
19               Eastern District Of California

20

21

22

23

24

25

26

27

28

## EXHIBIT A

### SETTLEMENT AGREEMENT

This Settlement Agreement (or "Agreement") is entered into between Plaintiffs Deltakeeper Chapter of Baykeeper, Mother Lode Chapter of the Sierra Club, and Waterkeeper Alliance, Inc., (hereinafter collectively referred to as "Plaintiffs") and Joe M. Silva, Antonio M. Silva, and Silva Brothers Dairy  (hereinafter collectively referred to as "Silva CAFO Owners/Operators").  Plaintiffs and Silva CAFO Owners/Operators are hereinafter collectively referred to as the "Settling Parties" and enter into this Settlement Agreement with respect to the following facts, objectives, and commitments:

WHEREAS, Baykeeper is a regional non-profit public benefit corporation organized under the laws of the State of California.  Baykeeper's mission is to protect and enhance the water quality of the San Francisco Bay-Delta estuary and its watershed for the benefit of its ecosystems and human communities.  The Deltakeeper Chapter of Baykeeper carries out this mission on the Sacramento – San Joaquin River Delta ("Delta") and its tributaries in California's Great Central Valley.  The Deltakeeper Chapter of Baykeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and the natural resources of the Delta and other area receiving waters;

WHEREAS, Mother Lode Chapter of the Sierra Club is a chapter of Sierra Club, a national, non-profit environmental protection organization.  The purposes of Sierra Club and its chapters are to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives;

WHEREAS, Waterkeeper Alliance, Inc. is an international not-for-profit organization with a mission to connect and support local Waterkeeper programs, and to provide a voice for waterways and communities worldwide.  Each of these programs, in turn, is an independent, locally based advocacy group working to protect and restore watersheds in their home communities.  Both Baykeeper and the Deltakeeper Chapter of Baykeeper are member programs of the Waterkeeper Alliance;

WHEREAS, Joe M. Silva, Antonio M. Silva, and Silva Brothers Dairy own and/or operate a dairy operation at 12997 E. Peltier Road, Acampo, CA 95220.  Joe M. Silva and Antonio M. Silva own TAJ Silva Farms, LLC.  Joe M. Silva and Antonio M. Silva are the owners of the property located at

12997 E. Peltier Road, Acampo, CA 95220.  The property located at 12997 E. Peltier Road, Acampo, CA 95220 is a dairy operation and is referred to herein as the "Silva CAFO."

WHEREAS, on April 21, 2006, Plaintiffs served Joe M. Silva, Antonio M. Silva, TAJ Silva Farms, LLC, and Silva Brothers Dairy, Inc. with a notice of intent to file suit ("Notice Letter") under Sections 505(a)(1) and (f) of the Federal Water Pollution Control Act ("Clean Water Act"), 33 U.S.C. § 1365(a)(1) and (f).  The Notice Letter alleged that Joe M. Silva, Antonio M. Silva, TAJ Silva Farms, LLC, and Silva Brothers Dairy, Inc. have been and continue to be in violation of Sections 301(a) and 402(p) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342(p), for failure to obtain a National Pollutant Discharge Elimination System ("NPDES") Permit for alleged discharges containing pollutants from the Silva CAFO to waters of the United States;

WHEREAS, on June 29, 2006, Plaintiffs filed a complaint in the United States District Court, Eastern District of California (Civil Case No. CV 06-01452 DFL (DAD), which is now Civil Case No. 06-014252 OWW (DLB)) alleging violations of the Clean Water Act ("Complaint");

WHEREAS, Joe M. Silva, Antonio M. Silva, and TAJ Silva Farms, LLC  have filed answers denying the claims asserted in the Complaint;

WHEREAS, the Silva Brothers Dairy, Inc. is dissolved and is dismissed with prejudice;

WHEREAS, Joe M. Silva and Antonio M. Silva own TAJ Silva Farms, LLC.  Documentary evidence filed with the Secretary of State provides that TAJ Silva Farms, LLC is involved in the business of farming at 12997 E. Peltier Road in Acampo, California.  Defendant TAJ Silva Farms, LLC admitted in its answer to the complaint that it was an owner or operator of the Silva CAFO.  TAJ Silva Farms, LLC has represented to Plaintiffs that the admission in the answer was a mistake and that TAJ Silva Farms, LLC does not own or operate the Silva CAFO.  In the interest of avoiding extensive discovery and to settle this action without further expense or delay, which all parties agree is in the parties' best interest, the parties agree to dismiss TAJ Silva Farms, LLC without prejudice.  Plaintiffs specifically reserve their right to refile the action against TAJ Silva Farms, LLC if the Silva CAFO Owners/Operators cannot or will not adequately remedy any breach of this Settlement Agreement;

WHEREAS, the Settling Parties have agreed that it is in the Settling Parties' mutual interest to resolve their disputes through settlement in the form of this Settlement Agreement without further Court proceedings;

WHEREAS, the Settling Parties have further agreed that entry into and compliance with this Settlement Agreement shall not be construed as an admission by any party of any fact, issue of law, or violation of law, and that nothing in this Settlement Agreement shall prejudice, waive or impair any right, remedy, or defense in any other or future legal proceedings, except that it shall be binding in any proceedings between the Parties related to any claims which were raised in the Complaint based on the facts alleged therein;

WHEREAS, the Settling Parties without admitting any liability or wrongdoing have agreed to settle their disputes and resolve this action as set forth herein;

WHEREAS, the Settling Parties have further agreed that there is no prevailing party or substantially prevailing party, whether under 33 U.S.C. §1365(d), 28 U.S.C. §2412(d) or any other statute or law, and that except as set forth herein, each party shall bear its own attorneys' fees and costs.

WHEREAS, this Court has jurisdiction over this action and over the Settling Parties;

WHEREAS, pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. §1365(c)(1), the proper venue for this action is the United States District Court for the Eastern District of California since Silva Dairy is located within this judicial district.

## II.    DEFINITIONS

1.    **Best Management Practices or BMPs.**  "Best Management Practices" or "BMPs" as used herein refers and relates to schedules of activities, prohibitions of practices, maintenance procedures, and other structural and non-structural management practices to prevent or reduce the pollution of waters of the state and/or the United States.

2.    **CAFO Waste.**  "CAFO Waste" as used herein refers to the many types of waste material located at the Silva CAFO, such as liquid and solid manure, bedding, spilled or spoiled feed, animal hair, wastewater, wash water, cleaning compounds, contaminated sediment and dirt, and pollutants associated with concentrated animal feeding operations.

3.   **Clean Water Act.**  "Clean Water Act" as used herein refers to the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.

4.   **Discharge**.  "Discharge" as used herein means any intentional or accidental release or uncontrolled flow of CAFO Waste and/or water that either leaves the Silva CAFO and reaches a surface water or reaches a ditch, or lateral, which is connected to a surface water.  Discharge does not include agricultural storm water runoff as that term is defined under the Clean Water Act and interpreted by the courts such as in *Waterkeeper Alliance et al. v. EPA*, 399 F.3d 486 (2nd Cir. 2005).

5.   **Draft WDR**.  "Draft WDR" as used herein refers to the draft "Waste Discharge Requirements General Order For Existing Milk Cow Dairies, Order No. _____," which is attached as Exhibit 1.

6.   **Lagoons**.  "Lagoons" as used herein refers to the open pits, ponds, or other surface impoundments used for storage of liquefied CAFO Waste either before or after it is applied to a Land Application Field.

7.   **Land Application Field.**  "Land Application Field" as used herein refers to any parcel owned or under the control of the Silva CAFO Owners/Operators that is used for the land application and/or disposal of CAFO Waste and the growing of crops.

8.   **Monitoring and Reporting Program**.  "Monitoring and Reporting Program" as used herein refers to the draft "Monitoring and Reporting Program No. _____, General Order for Existing Milk Cow Dairies."  A copy of the Monitoring and Reporting Program is attached as Exhibit 2.

9.   **Regional Board**.  "Regional Board" as used herein refers to the California Regional Water Quality Control Board, Central Valley Region.

10.   **Silva CAFO.**  "Silva CAFO" as used herein refers to the all of the land, structures and animal housing, and solid or liquid manure management and application systems used by the Silva CAFO Owners/Operators at the property located at 12997 E. Peltier Road, in Acampo, California, which include, but are not limited to, the corrals, barns, Lagoons, other structures, and Land Application Fields.

11.   **State Board**.  "State Board" as used herein refers to the California State Water Resources Control Board.

12.   **Waste and Nutrient Management Plan or WNMP.** "Waste and Nutrient Management Plan" or "WNMP" as used herein refers to the plan containing the waste management and pollution prevention measures required by the Regional Board, the Clean Water Act, and this Settlement Agreement and includes, but is not limited to, those measures developed and implemented to control and prevent the release of CAFO Waste at the Silva CAFO.

III.   **COMMITMENTS OF DEFENDANT**

   A.   **NPDES Permit Application Submittal.**

13.   Within five (5) days of the Effective Date of this Settlement Agreement, the Silva CAFO Owners/Operators shall submit an application to the Regional Board for an NPDES permit regulating the Silva CAFO.  The form of the application to be submitted is attached hereto as Exhibit 3.  The Silva CAFO Owners/Operators are currently preparing a Waste and Nutrient Management Plan ("WNMP"), as set forth below in Paragraphs 14 and 15, and shall submit this WNMP to the Regional Board at which time the complete NPDES permit application shall be considered submitted to the Regional Board.  The Silva CAFO Owners/Operators agree to send the permit application and associated documents to Plaintiffs concurrently with their submission of these documents to the Regional Board.  Once the Silva CAFO Owners/Operators submit the permit application to the Regional Board, the Silva CAFO Owners/Operators shall respond in a reasonably prompt and complete manner to any and all future requests by the Regional Board for additional or supplemental information related to the Silva CAFO Owners/Operators' NPDES permit application.  The Silva CAFO Owners/Operators will not be under any obligation to institute any legal or judicial proceeding to force the Regional Board to act upon the Silva CAFO Owners/Operators' NPDES permit application, but the Silva CAFO Owners/Operators understand that Plaintiffs may decide to bring such a proceeding.

   B.   **Waste and Nutrient Management Plan and Best Management Practices.**

14.   Develop a Waste and Nutrient Management Plan.  No later than forty-five (45) days from the Effective Date of this Agreement, the Silva CAFO Owners/Operators shall prepare, and submit to Plaintiffs and the Regional Board, their draft WNMP for the Silva CAFO. The draft WNMP that is submitted to the Regional Board shall include an implementation schedule for each aspect of the WNMP and shall address and include the requirements of this

Settlement Agreement, of the Regional Board, including the attached Draft WDR, and the Environmental Protection Agency's ("EPA") regulations, including those listed at 40 C.F.R. § 412.4. If the requirements of the Regional Board, the State Board and/or the EPA change and require revisions to the Silva CAFO WNMP, the Silva CAFO Owners/Operators shall revise their WNMP (whether still in draft form or after final approval by the Regional Board) and resubmit it to Plaintiffs and to the Regional Board for approval.

15.    As set forth above, the Silva CAFO Owners/Operators shall provide Plaintiffs with a copy of the WNMP as soon as possible but within at least forty-five (45) days from the Effective Date of this Settlement Agreement. As soon as is reasonably possible, Plaintiffs shall provide comments on the draft WNMP to the Silva CAFO Owners/Operators. The Silva CAFO Owners/Operators are not bound by Plaintiffs' comments but agree to make good faith efforts to either incorporate Plaintiffs' comments into the WNMP or, in any instance in which they disagree with Plaintiffs' comments, provide a written basis for not incorporating those comments. Notwithstanding Plaintiffs' provision of comments on the draft WNMP, Plaintiffs reserve the right to submit comments to the Regional Board on the final WNMP. The Settling Parties acknowledge that the final WNMP, as well as any of the terms or conditions regarding any NPDES permit that results from the Silva CAFO Owners/Operators' submission of the application referenced in Paragraph 13 above, shall be determined by the Regional Board after the public process authorized by the Clean Water Act and other applicable law has been followed to completion. The Silva CAFO Owners/Operators shall notify Plaintiffs if the Regional Board has an issue or concern over the Silva CAFO Owners/Operators' WNMP that relates to the requirements of paragraph 14, and Plaintiffs will have the burden of addressing and resolving this concern with the Regional Board. The Silva CAFO Owners/Operators agree to revise and implement the WNMP as necessary and/or as required by the Regional Board and to provide Plaintiffs a copy of any revised WNMP within seven (7) days of its revision.

16.    Employee Training. Within sixty (60) days of the Effective Date, the Silva CAFO Owners/Operators shall provide appropriate training to all individuals, including but not limited to employees, contractors, sub-contractors, and/or agents, working at the Silva CAFO. This

initial training shall be provided by a private consultant familiar with the WNMP, the NPDES

permit applied for by the Silva CAFO, and the state and federal regulations and requirements

applicable to the Silva CAFO and shall include training on the WNMP requirements, BMP

implementation and maintenance, and the monitoring and sampling required by the WNMP and

this Settlement Agreement to all individuals then working at the Silva CAFO.  Any individuals

hired after the initial training shall be trained by either a private consultant as above or by

individuals who have already been trained by a private consultant as set forth above in the

particular endeavor for which the newly-hired individual will be engaged.  The Silva CAFO

Owners/Operators also agree to provide additional training as necessary to ensure compliance

with this Settlement Agreement and/or applicable requirements, as well as provide additional

training within fourteen (14) days subsequent to any amendment and/or revision to the WNMP.

Training shall be repeated as necessary to ensure that all such employees are familiar with and in

compliance with these requirements, and at a minimum training shall be repeated on an annual

basis.  All individuals will receive this training prior to assuming responsibilities for compliance

with this Settlement Agreement and/or state and federal requirements.

### C.    Action Plan for Discharges

17.    The Silva CAFO Owners/Operators agree to develop and implement an action plan

for Discharge(s) occurring after the Effective Date of this Agreement.  The action plan will

include: (i) an assessment and identification of the activities at the Silva CAFO that cause or

contribute to the Discharge(s); (ii) identification of modifications to existing BMPs and/or the

development of new BMPs designed to prevent future Discharge(s), and; (iii) a schedule to

implement the BMPs by the earliest practicable time; and, (iv) the revision of the WNMP as

necessary.

18.    The Silva CAFO Owners/Operators agree to submit each action plan to Plaintiffs

within fourteen (14) days of receipt of sampling results of any Discharge, or if no sample of the

Discharge was collected within seven (7) days of the Discharge.  Plaintiffs shall have twenty-one

(21) days upon receipt of the Silva CAFO Owners/Operators action plan to provide the Silva

CAFO Owners/Operators with comments.  The Silva CAFO Owners/Operators shall respond to

Plaintiffs within fourteen (14) days of receipt of Plaintiffs' comments.  The Settling Parties will meet and confer if there are any disagreements regarding any action plan as set forth in Section VII below.  The Silva CAFO Owners/Operators shall notify Plaintiffs in writing when an action plan has been implemented.  Compliance with a mutually-agreed upon action plan shall be considered compliance with the required actions for the Discharge(s).  The Silva CAFO Owners/Operators' obligation to prepare a written action plan under this Paragraph will expire at the termination of this Settlement Agreement.  Any of the Settling Parties may submit correspondence, reports, sampling results, proposed actions plans or comments thereto with regard to any future Discharge(s) to the Regional Board or its staff.

### D.   Monitoring and Reporting

19.   Reporting.  During the life of this Settlement Agreement, the Silva CAFO Owners/Operators agree to provide Plaintiffs with a copy of all documents or data generated as required or contemplated by this Settlement Agreement and/or which are submitted to the Regional Board, EPA, and/or any regulatory agency, which refer or relate to the Silva CAFO, at the same time the documents are sent to the regulatory agency. The Silva CAFO Owners/Operators shall provide Plaintiffs with all results of sampling analyses within seven (7) days of the Silva CAFO Owners/Operators' receipt of such information

20.   Site Inspections.  For the term of this Settlement Agreement, Plaintiffs and/or their representatives, and Plaintiffs' consultant, who is currently Mr. Alan Gay of U.S.K.H, may conduct up to two (2) yearly site inspections at the Silva CAFO ("Site Inspections").  It is the Settling Parties' intent that the Site Inspections will consist of one rainy season inspection ("Rainy Season Inspection") and one inspection when liquid and/or solid CAFO waste is being applied to the Land Application Fields ("Land Application Inspection").  Each inspection shall be scheduled for a mutually convenient date and time.  Plaintiffs and/or their representatives, and Plaintiffs' consultant, may also conduct additional inspection(s) of the Silva CAFO in the event of a Discharge(s), which shall be scheduled at a mutually convenient date and time.  If requested in advance the Silva CAFO Owners/Operators shall schedule a mutually convenient time for Plaintiffs to conduct a Land Application Inspection when solid and/or liquid CAFO Waste is going to be applied to Land Application Field(s).

a.      During the Site Inspections, the Silva CAFO Owners/Operators shall provide reasonable access to the Silva CAFO and the WNMP, and to all relevant records, reports and data for the Silva CAFO.

b.      During the Site Inspections, Plaintiffs or their representatives may collect split samples of any media, including but not limited to CAFO Waste, soil, and/or storm water discharges whenever possible.  A certified California laboratory shall analyze storm water samples collected by Plaintiffs and any and all results of any testing shall be provided to the Silva CAFO Owners/Operators within seven (7) days of Plaintiffs' receipt of such results.

c.      Plaintiffs and their representatives agree to abide by applicable health and safety plans, bio-security protocol, and/or other necessary protocol.  Plaintiffs agree to indemnify and hold the Silva CAFO Owners/Operators harmless or any liability, loss, damage or other injury suffered or sustained as a result of any action or inaction by Plaintiffs, their legal counsel and/or any of their representatives during any Site Inspection.

**E.      Supplemental Environmental Project**

21.     The Settling Parties, recognizing the value of collecting data and monitoring CAFO operations agree that the Silva CAFO Owners/Operators shall develop and implement a monitoring and reporting program at the Silva CAFO as set forth herein.  Specifically, the Silva CAFO Owners/Operators agree to develop and implement a Monitoring and Reporting Program that meets the requirements of this Settlement Agreement and the requirements set forth in Exhibit 2.  Sampling reductions sought by the Silva CAFO Owners/Operators from the Regional Board will not impact or change the Silva CAFO Owners/Operators' obligations to conduct the sampling as set forth in paragraph 21(a) – (c).  In addition, during the life of this Settlement Agreement, the Silva CAFO Owners/Operators shall also conduct the following additional monitoring and reporting:

a.      Each year during the life of this Settlement Agreement the Silva CAFO Owners/Operators shall collect and analyze a total of four (4) samples of storm water runoff from each Land Application Field(s).  The Silva CAFO Owners/Operators will sample 4 storm water runoff events unless less than 4 storm water runoff events occurs.  If less than 4 storm water runoff events occur the

Silva CAFO Owners/Operators will sample the storm water runoff events that do occur up to collecting 4 storm water runoff samples per year.

   b. During the life of this Settlement Agreement the Silva CAFO Owners/Operators shall collect and analyze soil samples in the first year after the Effective Date and at least once more during the life of this Settlement Agreement.

   c. If the Silva CAFO Owners/Operators' groundwater monitoring, as required by Monitoring Provision A.15, detects ammonia (using a detection limit of 1.5 mg/L or less) in any concentration on two (2) or more occasions or any sample result of nitrate at or above 15 mg/L on two (2) or more occasions or any sample result of nitrate above 20 mg/L on any occasion, the Silva CAFO Owners/Operators agree to conduct additional groundwater testing or monitoring.  If the Silva CAFO Owners/Operators must conduct additional groundwater testing or monitoring, the Settling Parties shall meet and confer within ten (10) days of the Silva CAFO Owners/Operators' receipt of data indicating additional groundwater testing or monitoring is required to discuss a practical solution.  If no agreement can be reached on an appropriate response, the Settling Parties will meet and confer as set forth in Section VII below.

  **F.**  **Litigation Fees and Costs and Settlement Payment**

  22. <u>Fees Incurred as of the Effective Date of this Decree.</u>  The Settling Parties agree that each is to bear its own attorneys' fees and costs incurred as of the Effective Date of this Settlement Agreement.  However, in recognition of the expense incurred by Plaintiffs in bringing this action, the Silva CAFO Owners/Operators agree to pay Plaintiffs the sum of $30,000.00, according to the following schedule: the first payment of $10,000.00 shall be made within seven (7) days of the Effective Date of this Settlement Agreement; the second payment of $10,000.00 shall be made within one calendar year from the Effective Date of this Agreement; the third payment of $10,000.00 shall be made within 2 calendar years from the Effective Date of this Agreement.  Payment shall be made to "Lawyers for Clean Water Attorney Client Trust Account" and addressed to: Lawyers for Clean Water, Inc., 1004 O'Reilly Avenue, San Francisco, CA 94129.

23.    To help defray the costs and fees of Plaintiffs' consultant's review of the WNMP and related documents, and conducting one Site Inspection per year, the Silva CAFO Owners/Operators agree to pay Plaintiffs' consultant, who is currently Mr. Alan Gay, up to $2,000.00 annually for each of the three years under the term of this Settlement Agreement, but in no case shall the Silva CAFO Owners/Operators pay more than $6,000.00 during the life of this Settlement Agreement.  For the first year only, the $2,000 maximum shall be for Plaintiffs' consultant's actual costs and fees incurred in the review of the WNMP and related documents and for one Site Inspection.  During the second and third years of the Settlement Agreement, the $2,000 annual maximum shall be limited to the actual costs and fees of Plaintiffs' consultant incurred in attending and conducting one Site Inspection, designated in advance by Plaintiffs.  However, Plaintiffs' consultant can review WNMP and related documents if no additional costs are incurred beyond those that would be incurred by Plaintiffs' consultant conducting the Site Inspection.  Plaintiffs' consultant shall invoice the Silva CAFO Owners/Operators directly for the costs and fees incurred pursuant to this Paragraph and the Silva CAFO Owners/Operators agree to reimburse Plaintiffs' consultant within 15 days of receiving such invoice.

**IV.    COMMITMENTS OF PLAINTIFFS**

24.    Filing Form Consenting to Proceed Before Magistrate Judge Beck:  Provided Plaintiffs have received a consent form from the Silva CAFO Owners/Operators, Plaintiffs will file the forms to consent to proceed before the Honorable Magistrate Judge Beck for all parties within one (1) day of the Effective Date of this Settlement Agreement.

25.    Filing Settlement Agreement.  Within 2 days of the Effective Date, Plaintiffs shall file this Settlement Agreement and Proposed Order with the Court.

26.    Review by Federal Agencies.  Plaintiffs shall submit this Settlement Agreement and Proposed Order to EPA and the U.S. Department of Justice ("DOJ") within 2 days of the Effective Date for review consistent with 40 C.F.R. § 135.5.  The review period expires forty-five 45 days after receipt of this Settlement Agreement by both agencies.  In the event that EPA or DOJ comments negatively on the provisions of this Settlement Agreement, the Settling Parties agree to meet and confer to attempt to resolve the issue(s) raised by EPA or DOJ.

**V.**     **DURATION OF SETTLEMENT AGREEMENT**

27.     This Settlement Agreement shall remain in effect for three (3) years from the Effective Date.

**VI.**     **PERFORMANCE OF SETTLEMENT AGREEMENT**

28.     <u>Force Majeure</u>.  The Silva CAFO Owners/Operators shall notify Plaintiffs pursuant to the terms of this Paragraph, where implementation of the steps set forth in this Settlement Agreement, within the deadlines set forth in those paragraphs, becomes impossible, despite the timely good-faith efforts of the Silva CAFO Owners/Operators or any of them, due to circumstances beyond the control of the Silva CAFO Owners/Operators or their agents, and which could not have been reasonably foreseen and prevented by the exercise of due diligence by the Silva CAFO Owners/Operators.  Circumstances beyond the Silva CAFO Owners/Operators' control include, but are not limited to, delays or changed conditions occasioned by changes to statutory, regulatory, or other applicable state or federal law. Delays due to unanticipated or increased costs or expenses associated with the completion of any work or activity under this Settlement Agreement, changed financial circumstances, or the Silva CAFO Owners/Operators' failure to make timely and bona fide applications and to exercise diligent efforts to obtain permits, or normal inclement weather shall not, in any event, be considered to be circumstances beyond the Silva CAFO Owners/Operators' control.

a.     The Silva CAFO Owners/Operators claiming impossibility shall notify Plaintiffs in writing within ten (10) days of the date that the Silva CAFO Owners/Operators first knew of the event or circumstance or should have known of the event or circumstance by the exercise of due diligence and shall describe the reason for the non-performance.  The Silva CAFO Owners/Operators' notice shall specifically refer to this Section of the Settlement Agreement and describe the anticipated length of time the delay may persist, the cause or causes of the delay, the measures taken or to be taken by the Silva CAFO Owners/Operators to prevent or minimize the delay, the schedule by which the measures will be implemented, and the anticipated date of compliance.  The Silva CAFO Owners/Operators shall adopt all reasonable measures to avoid and minimize such delays.

b.     The Settling Parties shall meet and confer in good-faith concerning the non-performance and, where the Settling Parties concur that the non-performance was or is impossible,

despite the timely good faith efforts of the Silva CAFO Owners/Operators, due to circumstances beyond the control of the Silva CAFO Owners/Operators, that could not have been reasonably foreseen and prevented by the exercise of due diligence by the Silva CAFO Owners/Operators, new performance deadlines shall be established.

c.      If Plaintiffs disagree with the Silva CAFO Owners/Operators' notice, or in the event that the Settling Parties cannot timely agree on the terms of such a stipulation, either party shall have the right to invoke the dispute resolution procedures described herein.  In such proceeding, the Silva CAFO Owners/Operators shall bear the burden of proving that any delay of any requirement of this Settlement Agreement was caused or will be caused by Force Majeure and the extent of any delay attributable to such circumstances.

## VII.    DISPUTE RESOLUTION PROCEDURES

29.    <u>Meet and Confer</u>.  If any party believes that a breach of this Settlement Agreement has occurred, the Settling Parties shall meet and confer within ten (10) days of receiving written notification of a request for such meeting.

30.    During the meet and confer proceeding, the Settling Parties shall discuss the dispute and make best efforts to devise a mutually agreed upon plan, including implementation dates, to resolve the dispute.

31.    If either party fails to meet and confer or the meet and confer does not resolve the dispute, after at least ten (10) days have passed after the meet and confer occurred or should have occurred, either party shall be entitled to initiate the formal dispute resolution procedures in Paragraph 32 below.

32.    <u>Formal Dispute Resolution</u>.  If any meet and confer process provided for in this Settlement Agreement has been terminated and the Settling Parties' disputes have not been resolved, the Settling Parties agree to file concurrent briefs before Judge Beck, to determine whether either party is in breach of this Settlement Agreement and, if so, to require the breaching party to remedy any breach identified by the District Court within a reasonable time frame.  Within 3 days of receiving one party's notice to invoke formal dispute resolution the Settling Parties agree to call the court clerk to schedule a hearing date that gives the Settling Parties at least 14 days to file their concurrent briefs before the hearing.  The party initiating the dispute resolution procedures identified in this Paragraph may request an expedited

hearing schedule.  If Judge Beck is not available to perform the role identified herein, the Settling Parties agree that the dispute resolution process shall be re-assigned pursuant to applicable rules of the District Court.  The prevailing or substantially prevailing party in a motion before the Court, may be awarded their reasonable costs and attorneys' fees incurred during the meet and confer and formal dispute resolution processes consistent with Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

## VIII.   MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

33.    In consideration of the above, upon the Effective Date, the Settling Parties, on behalf of themselves and their respective representatives, agents, brokers, attorneys, employees, servants, consultants, heirs, successors, predecessors, members and assigns hereby fully release and discharge each other from any and all rights, claims (asserted or unasserted), actions and causes of action, suits, debts, demands, reimbursements, contracts, covenants, liens, liabilities, losses, costs, expenses (including, without limitation, attorney's fees), and damages of any nature, kind and description, known or unknown, anticipated or unanticipated, suspected or unsuspected, in law or in equity, arising out of, based on and/or in any way related to any allegations, claims and demands mentioned or referred to, or which might have been or could have been asserted in the Complaint up to and including the Effective Date of this Settlement Agreement.

34.    The Settling Parties hereto acknowledge that they have been advised by counsel and are familiar with California Civil Code Section 1542 which provides as follows:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

35.    The Settling Parties hereto, being aware of the foregoing code section, expressly waive to the extent applicable any rights they may have thereunder, as well as under any other statutes or common law principles of similar effect.  The Settling Parties hereto acknowledge that they may hereafter discover facts different than, or in addition to, those that it now knows or believes to be true with respect to the claims related herein, and each of them agrees that this general release shall be and remain effective in all respects, notwithstanding later discovery of different or additional facts or evidence.

36.     Notwithstanding anything set forth in Paragraphs 33-35 above, the Releases shall not apply to the Settling Parties' respective executory obligations, covenants, conditions and representations set forth in this Settlement Agreement, none of which shall be released.

37.     In addition, nothing in this Settlement Agreement limits or otherwise affects the Settling Parties' right to address or take any position that it deems necessary or appropriate in any formal or informal proceeding before the Regional Board, EPA, or any other judicial or administrative body on any other matter relating to the Settling Parties.

## IX.     MISCELLANEOUS AND GENERAL PROVISIONS

38.     Neither the Settlement Agreement nor any payment pursuant to the Settlement Agreement shall constitute or be construed as a finding, adjudication, or acknowledgment of any fact, law, or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation.  The Silva CAFO Owners/Operators maintain and reserve all defenses they may have to any alleged violations that may be raised in the future.

39.     The Court shall retain jurisdiction to enforce the terms and conditions of this Settlement Agreement and to resolve disputes arising hereunder as may be necessary or appropriate for the construction or execution of the Settlement Agreement up to and including the date of termination subject to any and all applicable defenses the Settling Parties may have under law.

40.     Construction.  The language in all parts of this Settlement Agreement shall be construed in accordance with the law and according to its plain and ordinary meaning, except as to those terms defined in the applicable NPDES permits, Clean Water Act, or specifically herein.

41.     Choice of Law.  The laws of the State of California and the United States shall govern this Settlement Agreement.

42.     Severability.  In the event that any provision, paragraph, section, or sentence of this Settlement Agreement is held by a Court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

//

//

//

43. Correspondence. All notices required or contemplated by this Settlement Agreement or any other correspondence pertaining to this Settlement Agreement shall be sent by regular, certified, or overnight mail as follows:

> If to Plaintiff Organizations:  Deb Self
>             Baykeeper
>             785 Market Street, Suite 850
>             San Francisca, CA 94103
>
> With copies to:      Layne Friedrich
>             Lawyers for Clean Water, Inc.
>             1004A O'Reilly Ave.
>             San Francisco, CA 94129
>
> If to Silva CAFO Owners/Operators: Joe Silva
>             12997 E. Peltier Road,
>             Acampo, CA 95220
>
> With copies to:      Eric E. Bronson
>             Bird Marella Boxer Wolpert Nessim Drooks & Lincenberg
>             1875 Century Park East, 23rd Floor
>             Los Angeles, CA 90067

Notifications of communications shall be deemed submitted three (3) days after the date that they are postmarked and sent by first-class mail or deposited with an overnight mail/delivery service. Any change of address or addresses shall be communicated in the manner described above for giving notices. In addition, the Settling Parties may agree to transmit documents electronically or by facsimile.

44. Effect of Settlement Agreement. Plaintiffs do not, by their consent to this Settlement Agreement, warrant or aver in any manner that the Silva CAFO Owners/Operators' compliance with this Settlement Agreement will constitute or result in compliance with any federal or state law or regulation. Nothing in this Settlement Agreement shall be construed to affect or limit in any way the obligation of the Silva CAFO Owners/Operators to comply with all federal, state, and local laws and regulations governing any activity required by this Settlement Agreement.

45. Counterparts. This Settlement Agreement may be executed in any number of counterparts, all of which together shall constitute one original document. Telecopy and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Settlement Agreement.

46.   <u>Modification of the Settlement Agreement</u>.  This Settlement Agreement, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Settling Parties.

47.   <u>Full Settlement</u>.  This Settlement Agreement constitutes a full and final settlement of this matter.

48.   <u>Integration Clause</u>.  This is an integrated Settlement Agreement.  This Settlement Agreement is intended to be a full and complete statement of the terms of the agreement between the Settling Parties and expressly supersedes any and all prior oral or written agreements covenants, representations, and warranties (express or implied) concerning the subject matter of this Settlement Agreement.

49.   <u>Authority</u>.  The undersigned representatives for Plaintiffs and the Silva CAFO Owners/Operators each certify that he/she is fully authorized by the party whom he/she represents to enter into the terms and conditions of this Settlement Agreement.

50.   The provisions of this Settlement Agreement apply to and bind the Settling Parties, including any successors or assigns.  The Settling Parties certify that their undersigned representatives are fully authorized to enter into this Settlement Agreement, to execute it on behalf of the Settling Parties, and to legally bind the Settling Parties to its terms.

51.   The Settling Parties agree to be bound by this Settlement Agreement and not to contest its validity in any subsequent proceeding to implement or enforce its terms.

52.   The term "Effective Date," as used in this Settlement Agreement, shall mean the last date on which the signature of a party to this Settlement Agreement is executed.

//
//
//
//
//
//
//

1       The Settling Parties hereby stipulate and enter into this Settlement Agreement.

2   **APPROVED AS TO CONTENT**:            For PLAINTIFFS:

3   Date: _____, 2007

4                                          _____

5                                          By:    Deb Self, Baykeeper

6                                          _____

7                                          By:    Aaron Isherwood, Sierra Club

8                                          _____

9                                          By:    Jeff Odefey, Waterkeeper Alliance, Inc.

10                                         For SILVA BROTHERS DAIRY,
11                                         JOE M. SILVA AND ANTONIO M. SILVA:

12  Date: _____, 2007

13                                         _____

14                                         By:    Silva Brothers Dairy

15                                         _____

16                                         By:    Joe M. Silva

17                                         _____

18                                         By:    Antonio M. Silva

19  **APPROVED AS TO FORM**:               For PLAINTIFFS:

20

21                                         _____

22                                         By:    Layne Friedrich
                                                  Lawyers For Clean Water, Inc.
23                                                Attorney for Plaintiffs

24                                         For JOE M. SILVA AND ANTONIO M. SILVA:

25

26                                         _____

27                                         By:    Eric Bronson
                                                  Bird/Marella
                                                  Attorneys for Joe M. Silva
28                                                and Antonio M. Silva

EXHIBIT 1

**CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
CENTRAL VALLEY REGION**

Order No. _____

WASTE DISCHARGE REQUIREMENTS GENERAL ORDER
FOR
EXISTING MILK COW DAIRIES

The California Regional Water Quality Control Board, Central Valley Region (hereafter, Central Valley Water Board), finds that:

### SCOPE OF COVERAGE OF THIS ORDER

1.  This Order serves as general waste discharge requirements for discharges of waste from existing milk cow dairies (defined in Finding 7) of all sizes.

2.  This Order applies to owners and operators of existing milk cow dairies (hereinafter Dischargers) that submitted a complete Report of Waste Discharge in response to the Central Valley Water Board's 8 August 2005 request for such a report. Following formal written notification by the Central Valley Water Board, these Dischargers are required to comply with the terms and conditions of this Order. Dischargers that do not qualify for coverage under this Order will be covered under separate general or individual waste discharge requirements or a waiver of waste discharge requirements.

### REASON FOR THE CENTRAL VALLEY WATER BOARD ISSUING THIS ORDER

3.  The Central Valley Water Board authority to regulate waste discharges that could affect the quality of the waters of the state, which includes both surface water and groundwater and the prevention of nuisances, is found in the Porter-Cologne Water Quality Control Act (California Water Code Division 7).

4.  California Water Code Section 13260 requires any person discharging waste, or proposing to discharge waste, within the Central Valley Region, that could affect the quality of the waters of the state to file a report of waste discharge with the Central Valley Water Board.

5.  The Central Valley Water Board is required to prescribe waste discharge requirements for proposed, existing, or material changes in discharges of waste and must implement the relevant water quality control plans. The Central Valley Water Board may prescribe general waste discharge requirements as to a category of discharges if all the following criteria apply to the discharges in that category:

    a.  The discharges are produced by the same or similar operations.

    b.  The discharges involve the same or similar types of waste.



    c.  The discharges require the same or similar treatment standards.

    d.  The discharges are more appropriately regulated under general requirements than individual requirements.

6.  In regulating discharges of waste, the Central Valley Water Board implements State laws and regulations.  California regulations governing discharges from confined animal facilities are contained in Title 27 of the California Code of Regulations (CCR), Division 2, Subdivision 1, Chapter 7, Subchapter 2, Article 1 (Title 27).

7.  For the purposes of this Order, an existing milk cow dairy includes all dairies that were operating as of 17 October 2005 and were requested by the Central Valley Water Board on 8 August 2005 to file a Report of Waste Discharge.

8.  Existing dairy operations include herd sizes that may vary in order to ensure a constant milk production volume.  Doing so requires a dairy operator to manage the herd, continually producing calves, raising support stock to replace cows that die or fail to produce, and selling some of the mature cows and support stock.

9.  Professionals at the University of California Davis estimate the normal variation in California dairy herd sizes ranges from about 10 to 15 percent.

10.  For the purposes of this Order, existing herd size is defined as the number of mature dairy cows reported in the Report of Waste Discharge submitted in response to the 8 August 2005 letter from the Executive Officer, plus or minus 15 percent of that reported number to account for the natural variation in herd sizes.

11.  For the purposes of this Order, an increase in the number of mature dairy cows of more than 15 percent beyond the number reported in the Report of Waste Discharge submitted in response to the 8 August 2005 letter from the Executive Officer is considered an expansion.

12.  There are approximately 1,600 milk cow dairies within the Central Valley Region (Region) that will be required to operate under the requirements of this Order.  Each facility represents a significant source of waste discharge with a potential to affect the quality of the waters of the State.

13.  For the purposes of this Order, "waste" includes, but is not limited to, manure, leachate, process wastewater and any water, precipitation or rainfall runoff that contacts raw materials, products, or byproducts such as manure, compost piles, feed, silage, milk, or bedding.

14.  This Order implements the requirements of State Water Resources Control Board Resolution 68-16 (*Statement of Policy with Respect to Maintaining High Quality of Waters in California*), Title 27 CCR for confined animal facilities, the Central Valley Water

Board's Water Quality Control Plan for the Sacramento and San Joaquin River Basins (4th Ed.) and the Water Quality Control Plan for the Tulare Lake Basin (2nd Ed.) (Basin Plans) and other applicable plans and policies of the State Water Resources Control Board (State Water Board) and the Central Valley Water Board described in the Information Sheet, which is attached to and made part of this Order.

## CALIFORNIA ENVIRONMENTAL QUALITY ACT

15. The Central Valley Water Board is the lead agency for purposes of the California Environmental Quality Act (CEQA) (Public Resources Code Section 21000 et seq.) with respect to adoption of this Order. 

16. In accordance with CEQA, the Central Valley Water Board adopted a Negative Declaration in 1982 with the adoption of Central Valley Water Board Resolution 82-036 (Waiving Waste Discharge Requirements for Specific Types of Discharge), which waived waste discharge requirements for confined animal facilities where the Discharger complies with Central Valley Water Board guidelines.  That waiver program expired on 1 January 2003. 

17. Food and Agricultural Code Section 33487 provides a statutory exemption from CEQA for dairy farms under the following circumstances:  (1) when the dairy will be constructed and operated in accordance with the minimum standards in Chapter 5 of the Food and Agricultural Code; (2) where the applicable local agencies have completed all necessary reviews and approvals including that required by CEQA; and (3) where a permit for construction was issued by a local agency on or after the effective date of Food and Agricultural Code Section 33487 and construction has begun. 

18. CEQA provides several categorical exemptions from CEQA that apply to this Order including:

    a. CEQA (Title 14 CCR Section 15301) for Existing Facilities that applies to "...*the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of use beyond that existing at the time of the lead agency's determination...*" 

    b. CEQA (Title 14 CCR Section 15302) for "...*replacement or reconstruction of existing structures and facilities where the new structure will be located on the same site as the structure replaced and will have substantially the same purpose and capacity as the structure replaced...*" 

    c. CEQA (Title 14 CCR Section 15304) for "*minor public or private alterations in the condition of land, water, and/or vegetation which do not involve removal of healthy, mature, scenic trees except for forestry and agricultural purposes...*" 



19.    The adoption of this Order is categorically exempt from CEQA because:

    a.    Consistent with the "existing facility" exemption in Title 14 CCR Section 15301, eligibility under this Order is limited to milk cow dairies that were existing facilities as of 17 October 2005.  This Order does not authorize expansion of use beyond that existing as of 17 October 2005.  Restoration of, or improvements to dairy waste management systems to ensure proper function in compliance with this Order will involve minor alterations of existing private facilities.

    b.    Consistent with the categorical exemption of Title 14 CCR Section 15302, this Order will require covered dairies to replace or reconstruct waste management systems to ensure proper function in compliance with this Order.

    c.    Consistent with the categorical exemption of Title 14 CCR Section 15304, this Order will require covered dairies to make improvements to their waste management systems that will result in minor alterations to land, water, and/or vegetation.

20.    This Order imposes significant new and more stringent requirements compared to previous waste discharge requirements or waivers of waste discharge requirements that have applied in the past to these existing facilities.  This Order requires compliance with State Water Resources Control Board Resolution 68-16, Title 27 CCR for confined animal facilities, and the Basin Plans.  As a result, existing milk cow dairies will reduce their impacts to surface water and groundwater upon compliance with this Order.  This Order prohibits:

    a.    Expansions of facilities while they are covered by this Order;

    b.    Discharges of waste and/or storm water to surface waters from the production area;

    c.    Discharges of waste to surface waters which causes or contributes to an exceedance of any applicable water quality objective in the Basin Plans or water quality criteria set forth in the California Toxics Rule or the National Toxics Rule;

    d.    Discharges of waste that causes pollution or nuisance;

    e.    Discharges of wastewater to surface waters during or following wastewater application to cropland;

    f.    Discharges of storm water to surface water from the land application area where manure or process wastewater has been applied unless the land application area has been managed consistent with a certified Nutrient Management Plan (see Attachment C, which is attached to and made part of this Order); and

This Order requires that discharges of waste from existing milk cow dairies shall not cause groundwater to be further degraded[1], to exceed water quality objectives, unreasonably affect beneficial uses, or cause a condition of pollution or nuisance.  This Order also requires monitoring of surface water and groundwater to demonstrate reduced impacts to surface water and groundwater upon compliance with this Order.

## DAIRY IMPACTS ON WATER QUALITY

21.   Groundwater monitoring shows that dairies in the Region have impacted groundwater quality.   A study of five dairies in a high-risk groundwater area in the Region found that groundwater beneath dairies that were thought to have good waste management and land application practices had elevated levels of salts and nitrates beneath the production and land application areas.  The Central Valley Water Board requested monitoring at 80 dairies with poor waste management practices in the Tulare Lake Basin.  This monitoring has also shown groundwater pollution under many of the dairies, including where groundwater is as deep as 120 feet and in areas underlain by fine-grained sediments.

22.   No set of waste management practices has been demonstrated to be protective of groundwater quality in all circumstances.  Since groundwater monitoring is the most direct way to determine if management practices at a dairy are protective of groundwater, Monitoring and Reporting Program No. ___, which is attached to and made part of this Order, requires groundwater monitoring to determine if a dairy is in compliance with the groundwater limitations of this Order.

23.   The Central Valley Water Board has documented many discharges of waste from existing milk cow dairies to surface water and has taken appropriate enforcement actions in such cases.  This Order prohibits discharges of: waste and/or storm water to surface water from the production area; wastewater to surface waters from cropland; and storm water to surface water from a land application area where manure or process wastewater has been applied unless the manure has been incorporated into the soil and the land application area has been managed consistent with a certified Nutrient Management Plan.  When such discharges do occur, this Order requires the Discharger to monitor these discharges.

24.   The milk cow dairies at which this Order is directed were in existence prior to October 2005 and many were constructed several decades ago.  The waste management systems at these existing dairies are commonly not capable of preventing adverse impacts on waters of the state either because of their outdated design or need for maintenance or both.  Historic operation of these dairies has presumptively resulted in an adverse effect on the quality of waters of the state.  Groundwater data are needed to determine the existence and magnitude of these impacts.  If data document impacts, continued operation of dairies without waste management improvements will perpetuate the ongoing adverse water quality effects caused by the generation and disposal of dairy waste.

---

[1] Further degradation will only be allowed under individual waste discharge requirements following an analysis as required by State Water Board Resources Control Board Resolution 68-16 (*Statement of Policy with Respect to Maintaining High Quality of Waters in California*).

25. As stated in Finding 18 above, this Order imposes new and more stringent requirements than these existing facilities have had applied to them in the past.  Many Dischargers will need to make significant improvements in their facilities to meet these requirements.  Some of these improvements (e.g., recycling flush water, grading, establishing setbacks, installing flow meters, exporting manure, leasing or purchasing land, etc.) can be made relatively quickly while some involve infrastructure changes (e.g., new retention ponds, additional piping, tailwater return systems, etc.) that may require more time to implement. The Central Valley Water Board believes it is reasonable to allow Dischargers time to phase in elements of the required Waste Management Plan and Nutrient Management Plan in order to adequately design and construct major infrastructure changes needed to comply with all the requirements of this Order.   This Order requires Dischargers to make any necessary interim facility modifications first in order to prevent discharges to surface water, improve storage capacity, and improve the facility's nitrogen balance before completing any necessary infrastructure changes.

## STATE WATER RESOURCES CONTROL BOARD RESOLUTION 68-16

26. State Water Resources Control Board Resolution 68-16 requires that any activity which discharges a waste to existing high quality waters must meet waste discharge requirements which will result in the best practicable treatment or control of the discharge necessary to assure that pollution or nuisance will not occur and the highest water quality consistent with the maximum benefit to the people of the State will be maintained.

27. To be consistent with State Water Resources Control Board Resolution 68-16, Dischargers must employ best practicable treatment or control measures to assure that pollution or nuisance will not occur and the highest water quality consistent with the maximum benefit to the people of the State will be maintained.   As noted in Finding 24 above, waste management improvements will be needed at many of the existing milk cow dairies to prevent ongoing adverse water quality effects caused by the generation and disposal of dairy waste. The goal of this Order is to require Dischargers, through monitoring, to first identify the existence, location, and magnitude of adverse water quality impacts and then determine where and what improvements in waste management are needed to prevent ongoing adverse water quality effects.  As noted in Finding 25 above, this Order allows Dischargers time to implement the needed improvements in order to achieve best practicable treatment or control measures.

### Best Practicable Treatment Or Control Measures For Retention Ponds

28. An October 2003 report (Task 2 Report) by Brown, Vence, and Associates concluded that the "…current Title 27 requirements are insufficient to prevent groundwater contamination from confined animal facilities, particularly in vulnerable geologic environments." In particular, the Task 2 Report concluded that the Title 27 requirement for retention ponds to be lined with, or underlain by, soils that contain at least 10 percent clay and not more than

10 percent gravel could result in seepage from a retention pond at a rate as high as 1 x 10$^{-3}$ cm/sec or greater.

29.   A November 2004 report (Task 4 Report) by Brown, Vence, and Associates recommended minimum criteria applicable to all confined animal facilities to protect groundwater quality, recognizing that based on site specific conditions, a facility may need to implement more stringent criteria and that best professional judgment would be necessary to demonstrate compliance with the appropriate performance goal (the performance goals evaluated in the Task 4 report included no release to underlying geologic materials, no change in groundwater quality, and no exceedances of water quality objectives). The minimum criteria included the design of retention ponds with liners that have a maximum seepage rate of 1 x 10$^{-6}$ cm/sec with no credit for manure sealing.  This minimum criteria was based on the Natural Resource Conservation Service (NRCS) guidelines in Appendix 10D of Chapter 7 of Part 651 (Agricultural Waste Management Field Handbook) of the 1992 United States Department of Agriculture National Engineering Handbook.

30.   In June 2006, NRCS issued California Conservation Practice Standard No. 313 (PS 313) for waste storage facilities that store manure, wastewater, and runoff as part of an agricultural waste management system.  NRCS practice standards establish the minimum level of acceptable quality for planning and designing a practice.  PS 313 specifies seepage criteria for retention ponds.  These criteria include a target maximum specific discharge (seepage) rate of 1 x 10$^{-6}$ cm/sec for all vulnerability/risk categories, except that: (1) a synthetic liner is required where the aquifer vulnerability and risk are high (i.e., groundwater is within five to 20 feet of the pond bottom, coarse soils, and the pond is within 100 to 600 feet from a domestic supply well), and (2) other storage alternatives are required when the aquifer vulnerability and risk are very high (i.e., groundwater is within five feet of the pond bottom and the pond is less than 1,500 feet from a public supply well or less than 100 feet from a domestic supply well).

31.   The Brown, Vence, and Associates Task 4 Report recommends a minimum criteria and the California NRCS PS 313 indicates minimum level of acceptable quality for design and construction of retention ponds to achieve a seepage rate of 1 x 10$^{-6}$ cm/sec or less.  This seepage rate criterium alone does not assure that a condition of pollution or nuisance will not occur and the highest water quality consistent with the maximum benefit to the people of the State will be maintained.  Other factors that must be considered include: depth to groundwater, water quality beneath the facility, nature of the material between the bottom of the retention pond and the first encountered groundwater, nature of the leachate from the retention pond, and facility wastewater management practices.

32.   Consistent with State Water Resources Control Board Resolution 68-16, this Order requires that new retention ponds or reconstructed existing ponds be designed and constructed to: (1) comply with General Specifications B.1 and the groundwater limitations in the Order, (2) have a seepage rate no greater than 1 x 10$^{-6}$ cm/sec with no credit for manure sealing, and (3) result in the best practicable treatment or control of the discharge necessary to prevent a condition of pollution or nuisance.

**Best Practicable Treatment or Control Measures for Land Application Areas**

33.    Pursuant to Title 40 Code of Federal Regulations Section 122.23(e), precipitation- related discharges from land application areas are considered agricultural storm water discharges and are not subject to the United States Environmental Protection Agency (USEPA) regulations for concentrated animal feeding operations (CAFOs) if the "…manure, litter, or process wastewater has been applied in accordance with site specific nutrient management practices that ensure appropriate agricultural utilization of the nutrients in the manure, litter, or process wastewater, as specified in Section 122.42(e)(1)(vi)-(ix)…"

34.    The USEPA has established best practicable control technology currently available for application of waste from large concentrated animal feeding operations to land application areas.  The best practicable control technology includes best management practices required by Title 40 Code of Federal Regulations Section 122.42(e)(1)(vi)-(ix).

35.    The technical standards for nutrient management as specified in Attachment C of this Order are consistent with the USEPA best practicable control technology and the best management practices required by Title 40 Code of Federal Regulations Section 122.42(e)(1)(vi)-(ix) and the large CAFO best practicable control technology.  Therefore, precipitation-related discharges from land application areas at facilities operating in compliance with this Order are agricultural storm water discharges.  And since they are consistent with USEPA best practicable control technology, the technical standards for nutrient management represent best practicable treatment or control for the purposes of State Water Resources Control Board Resolution 68-16.

36.    Farming practices on lands the receive dairy waste contribute salts, nutrients, pesticides, trace elements, sediments and other by-products that can affect the quality of surface water and groundwater.  Evaporation and crop transpiration remove water from soils, which can result in an accumulation of salts in the root zone of the soils at levels that retard or inhibit plant growth.  Additional amounts of water often are applied to leach the salts below the root zones.  The leached salts can reach groundwater or surface water.  Even using the most efficient irrigation systems and appropriate fertilizer application rates and timing to correspond to crop needs, irrigation of cropland will have some measurable impact on existing high quality groundwater as a result of the leaching required to protect the crops from salt buildup in the root zone.

37.    In land applications areas where groundwater is shallow, some Dischargers have installed subsurface (tile) drainage systems to maintain the groundwater level below the crop's root zone.  Drainage from these systems may be discharged directly to surface water bodies or to drainage ditches that discharge to surface water bodies.  Some of these systems discharge to evaporation basins that are subject to waste discharge requirements.  Discharges from these systems have elevated concentrations of salts, including nitrates and other nutrients.  This Order requires Dischargers who have these systems to identify their location and discharge point and to monitor discharges from these systems.

38. The majority of the Dischargers that will be covered under this Order have been operating for many years without a Nutrient Management Plan, which would have minimized the impacts of land applications of dairy waste to surface water and groundwater quality. This Order requires each Discharger to develop and implement a Nutrient Management Plan, which should result in improved water quality by reducing the amount of dairy waste applied to the land application areas.

39. Consistent with State Water Resources Control Board Resolution 68-16, this Order requires that process wastewater that is applied to land application areas under the Discharger's control and process wastewater that is applied to land application areas under control of a third party: (1) be managed according to a certified Nutrient Management Plan that is consistent with the technical standards specified in Attachment C, and (2) not cause groundwater to exceed the groundwater limitations of this Order.

## ENVIRONMENTAL STEWARDSHIP PROGRAMS

40. Environmental stewardship programs, such as the California Dairy Quality Assurance Program, and local ordinances can greatly assist the Central Valley Water Board efforts to assure compliance with this Order. Since its inception in 1998, the California Dairy Quality Assurance Program's efforts have resulted in dairy operators having a greater understanding of the need for water quality protection. Recently adopted local ordinances in several counties throughout the Region have also increased dairy operators' understanding of the needs for water quality protection.

41. Participation in an Environmental Stewardship Program or operation of a dairy in a county that has a local ordinance regulating dairies may assist an existing dairy facility in meeting the requirements of this Order but these programs are not a substitute for regulation under this Order.

## GENERAL FINDINGS

42. This Order does not authorize violation of any federal, state, or local law or regulation.

43. As stated in California Water Code Section 13263(g), the discharge of waste into waters of the state is a privilege, not a right, and this Order does not create a vested right to continue the discharge of waste. Failure to prevent conditions that create or threaten to create pollution or nuisance will be sufficient reason to modify, revoke, or enforce this Order, as well as prohibit further discharge.

44. This Order is not a National Pollutant Discharge Elimination System Permit issued pursuant to the Federal Clean Water Act. Any facility required to obtain such a permit must notify the Central Valley Water Board.



45. The Findings of this Order, supplemental information and details in the attached Information Sheet, and the Central Valley Water Board record on milk cow dairies, were considered in establishing the conditions of discharge.

46. The Central Valley Water Board has notified interested agencies and persons of its intent to issue this Order for discharges of wastes from existing milk cow dairies, and has provided them with an opportunity for a public hearing and an opportunity to submit comments.

47. The Central Valley Water Board, in a public meeting, heard and considered all comments pertaining to the proposal to regulate discharges of wastes from existing milk cow dairies under this Order.

48. Any person affected by this action of the Central Valley Water Board may petition the State Water Board to review this action.  The State Water Board must receive the petition within 30 days of the date on which the Central Valley Water Board adopted this Order.  Copies of the law and regulations applicable to filing petitions will be provided upon request.

IT IS HEREBY ORDERED that, pursuant to California Water Code Sections 13260, 13263, and 13267 and in order to meet the provisions contained in Division 7 of the California Water Code and regulations and policies adopted thereunder; all Dischargers specified by the Central Valley Water Board and all Dischargers that have submitted the appropriate fee and a complete Report of Waste Discharge in response to the Central Valley Water Board's 8 August 2005 request, their agents, successors, and assigns shall comply with the following:

## A.   PROHIBITIONS

1. The discharge of waste, other than as defined in Finding 13 above, or hazardous waste, as defined in California Water Code Section 13173 and Title 23 CCR Section 2521(a), respectively, is prohibited.

2. The direct or indirect discharge of waste and/or storm water from the production area to surface waters is prohibited[2].

3. The discharge of waste from existing milk cow dairies to surface waters which causes or contributes to an exceedance of any applicable water quality objective in the Basin Plans or any applicable state or federal water quality criteria, or a violation of any applicable state or federal policies or regulations is prohibited.

4. The discharge or disposal of waste from existing milk cow dairies that results in pollution or nuisance is prohibited.

---

[2] Discharges of pollutants from the production area to waters of the United States may not lawfully occur except in compliance with a National Pollutant Discharge Elimination System (NPDES) permit.  NPDES permit coverage is not provided by this Order, but must be obtained separately.



5.    The disposal of waste not generated by on-site animal production activities is prohibited unless a Report of Waste Discharge for the disposal has been submitted to the Executive Officer and the Central Valley Water Board has issued or waived waste discharge requirements (WDRs).

6.    The disposal of dead animals in any liquid manure or process wastewater system is prohibited. The disposal of dead animals at a dairy facility is prohibited except when federal, state or local officials declare a State of Emergency and where all other options for disposal have been pursued and failed and the onsite disposal complies with all state and local policies for disposal of dead animals[3].

7.    All animals shall be prohibited from entering any surface water within the animal confinement area (Title 27 CCR Section 22561).

8.    The application of waste to lands not owned, leased, or controlled by the Discharger without written permission from the landowner or in a manner not approved by the Executive Officer, is prohibited.

9.    The land application of manure or process wastewater to cropland for other than nutrient recycling is prohibited.

10.   The discharge of wastewater to surface waters from cropland is prohibited.  Irrigation supply water that comes into contact or is blended with waste or wastewater shall be considered wastewater under this Prohibition.

11.   The application of process wastewater to a land application area before, during, or after a storm event that would result in runoff of the applied water is prohibited.

12.   The discharge of storm water to surface water from a land application area where manure or process wastewater has been applied is prohibited unless the manure has been incorporated into the soil and the land application area has been managed consistent with a certified Nutrient Management Plan.

13.   The use of manure to construct containment structures or to repair, replace, improve, or raise existing containment structures is prohibited.

14.   The direct discharge of wastewater into groundwater via backflow through water supply or irrigation supply wells is prohibited.

15.   The expansion of the existing milk cow dairy facility is prohibited[4].

---

[3] In an emergency, guidance is provided by the *CAL/EPA Emergency Animal Disease Regulatory Guidance for Disposal and Decontamination* (October 20, 2004).
[4] Dischargers must submit a Report of Waste Discharge and obtain coverage under individual waste discharge requirements before any material facility expansion.  "Expansion" is defined in Attachment E.

Waste Discharge Requirements General Order No.____                    12
Existing Milk Cow Dairies

## B.   GENERAL SPECIFICATIONS

1.   The collection, treatment, storage, or disposal of wastes at an existing milk cow dairy shall not result in: (1) discharge of waste constituents in a manner which could cause degradation of surface water or groundwater except as allowed by this Order, (2) contamination or pollution of surface water or groundwater, or (3) a condition of nuisance (as defined by the California Water Code Section 13050).

2.   The existing milk cow dairy shall have facilities that are designed, constructed, operated, and maintained to retain all facility process wastewater generated during the storage period (maximum period of time anticipated between land application of process wastewater), together with all precipitation on and drainage through manured areas, up to and including during a 25-year, 24-hour storm (see item II of Attachment B, which is attached to and made part of this Order).

3.   In the Sacramento and San Joaquin River Basins, retention ponds and manured areas at existing milk cow dairies in operation on or before 27 November 1984 shall be protected from inundation or washout by overflow from any stream channel during 20-year peak stream flows. Existing milk cow dairies that were in operation on or before 27 November 1984 and that are protected against 100-year peak stream flows must continue to provide such protection. Existing milk cow dairies built or expanded after 27 November 1984 shall be protected against 100-year peak stream flows (Title 27 Section 22562(c)).

4.   In the Tulare Lake Basin, existing milk cow dairies that existed as of 25 July 1975 shall be protected from inundation or washout from overflow from any stream channel during 20-year peak stream flows and existing milk cow dairies constructed after 25 July 1975 shall be protected from 100-year peak stream flows. Existing milk cow dairies expanded after 8 December 1984 shall be protected from 100-year peak stream flows.

5.   Dischargers required to install new retention ponds in order to comply with the requirements of this Order (i.e., to increase the storage capacity to meet the existing facility conditions, not related to an expansion) shall construct such new retention pond(s) as required in General Specification B.7 below.

6.   Dischargers shall reconstruct existing retention ponds in compliance with General Specification B.7 below when groundwater monitoring demonstrates that the existing retention pond has impacted groundwater quality.

7.   New retention ponds or reconstructed existing ponds, as required in General Specifications B. 5 and B.6 above, shall be designed and constructed to: (1) comply with General Specification B.1 and the groundwater limitations in this Order, (2) have a seepage rate no greater than $1 \times 10^{-6}$ cm/sec with no credit for manure sealing, and (3) result in the best practicable treatment or control of the discharge necessary to prevent a condition of pollution or nuisance.

8.    Prior to the enlargement of an existing settling, storage, or retention pond or the construction of any such new pond not associated with an expansion, the Discharger shall submit a design report prepared and certified by a Civil Engineer who is registered pursuant to California law or other person as may be permitted under the provisions of the California Business and Professions Code to assume responsible charge of such work. Enlargement of any existing pond or construction of any new pond shall not begin until the Executive Officer notifies the Discharger in writing that the design report is acceptable. The design report shall include: (1) a demonstration that the proposed pond is in compliance with General Specification B.7 above, including calculations that demonstrate the amount and quality of seepage from the proposed pond and its effect on groundwater quality, (2) a construction quality assurance plan describing testing and observations needed to document construction of the pond in accordance with the design, and (3) an operations and maintenance plan for the pond.

9.    Prior to the placement of waste in any enlarged existing settling, storage, or retention pond or any such newly constructed pond, the Discharger shall submit a post construction report prepared and certified by a Civil Engineer who is registered pursuant to California law or other person as may be permitted under the provisions of the California Business and Professions Code to assume responsible charge of such work. Waste shall not be placed into the pond until the Executive Officer notifies the Discharger in writing that the post construction report is acceptable. The post construction report shall include: (1) verification that the pond meets the requirements of this Order as specified in General Specification B.7 including documentation of the results of the construction quality assurance testing and observations, (2) certification that the pond was constructed as designed, and (3) as-built diagrams.

10.   The level of waste in the process wastewater retention ponds shall be kept a minimum of two (2) feet from the top of each aboveground embankment and a minimum of one (1) foot from the ground surface of each belowground pond. Less freeboard may be approved by the Executive Officer when a Civil Engineer who is registered pursuant to California law, or other person as may be permitted under the provisions of the California Business and Professions Code to assume responsible charge of such work, demonstrates that the structural integrity of the pond will be maintained with the proposed freeboard.

11.   Retention ponds shall be managed and maintained to prevent breeding of mosquitoes and other vectors. In particular,

      a.    Small coves and irregularities shall not be allowed around the perimeter of the water surface;

      b.    Weeds shall be minimized through control of water depth, harvesting, or other appropriate method;

      c.    Dead algae, vegetation, and debris shall not accumulate on the water surface; and



    d.  Management shall be in accordance with the requirements of the Mosquito Abatement District.

12.  All precipitation and surface drainage from outside of the existing milk cow dairy (i.e., "run on") shall be diverted away from any manured areas unless such drainage is fully contained (Title 27 Section 22562(b)).

13.  All retention ponds must have a depth marker that clearly indicates the minimum capacity necessary to contain the runoff and direct precipitation from a 25-year, 24-hour storm event.

14.  All roofs, buildings, and non-manured areas located in the production area of the existing milk cow dairy shall be constructed or otherwise designed so that clean rainwater is diverted away from manured areas and waste containment facilities, unless such drainage is fully contained in the wastewater retention system (Title 27 Section 22562(b)).

15.  Roof drainage from barns, milk houses, or shelters shall not drain into the corrals unless the corrals are properly graded and drained (Title 3 CCR, Division 2, Chapter 1, Article 22, Section 661).

16.  The milk parlor, animal confinement area (including corrals), and manure and feed storage areas shall be designed and maintained to convey all water that has contacted animal wastes or feed to the wastewater retention system and to minimize standing water and the infiltration of water into the underlying soils.

17.  Unlined ditches, swales, and/or earthen-berm channels may not be used for storage of process wastewater, manure, or tailwater and may only be used for conveyance of process wastewater collected in the production area to the retention pond, conveyance of process wastewater from the retention pond to the land application area, irrigation return water management, or temporary control of accidental spills, or rainfall-induced overflows at existing milk cow dairies designed, constructed, operated, and maintained in compliance with General Specification B.2.

18.  The application of manure or process wastewater to the land application area must be done in a manner that is consistent with a certified Nutrient Management Plan that is developed as required in Required Reports and Notices H.2.b.

**C.  LAND APPLICATION SPECIFICATIONS**

1.  Land application of all waste from the facility to areas under the Discharger's control shall be conducted in accordance with a certified Nutrient Management Plan consistent with the technical standards for nutrient management as specified in Attachment C. The Nutrient Management Plan shall be modified within 30 days if monitoring shows that discharge from the land application fails to comply with the Groundwater Limitations of this Order or

surface water quality objectives or criteria.  The modifications must be designed to bring Dischargers into compliance with this Order.

2.  Land application of process wastewater to offsite property under third party control will be regulated by waste discharge requirements to be developed by the Central Valley Water Board.  Until such time that the waste discharge requirements are adopted, such land applications shall be conducted: (1) in accordance with a certified Nutrient Management Plan consistent with the technical standards for nutrient management as specified in Attachment C, and (2) under a written formal agreement, which shall be included in the Discharger's Nutrient Management Plan.  The Discharger shall include management of such land application areas as part of the Discharger's Nutrient Management Plan (see Contents of a Nutrient Management Plan in Attachment C).

3.  The Discharger shall have a written agreement with any third party that has control on the use of solid manure provided by the Discharger.  The written agreement with the third party shall be included in the Discharger's Nutrient Management Plan and shall specify plans for the use and management of the third party's land application area.  Land application areas under control of a third party that receive solid manure from the Discharger may be regulated under the Conditional Waiver of Waste Discharge Requirements for Discharges from Irrigated Lands (Order No. R5-2006-0053 for Coalition Group or Order No. R5-2006-0054 for Individual Discharger, or updates thereto) if the third party is a participant in a Coalition Group or has an Individual Discharger Waiver.

4.  Land application of wastes for nutrient recycling from existing milk cow dairies shall not cause the underlying groundwater to contain any waste constituent, degradation product, or any constituent of soil mobilized by the interactions between applied wastes and soil or soil biota, to exceed the groundwater limitations set forth in this Order.

5.  The application of animal waste and other materials containing nutrients to any cropland under control of the Discharger shall meet the following conditions:

    a.  The application is in accordance with a certified Nutrient Management Plan developed and implemented in accordance with Required Reports and Notices H.2.b and Attachment C of this Order; and

    b.  Records are prepared and maintained as specified in Record-Keeping Requirements of Monitoring and Reporting Program No. ____.

6.  The application of waste to cropland shall be at rates that preclude development of vectors or other nuisance conditions and meet the conditions of the certified Nutrient Management Plan.

7.  Land application areas that receive dry manure shall be managed through implementation of erosion control measures to minimize erosion and must be consistent with a certified Nutrient Management Plan.

8.   All process wastewater applied to land application areas must infiltrate completely within 72 hours after application.

9.   Process wastewater shall not be applied to land application areas during periods when the soil is at or above field moisture capacity unless consistent with a certified Nutrient Management Plan (see Attachment C).

10.  Manure and process wastewater shall not be applied closer than 100 feet to any down gradient surface waters, open tile line intake structures, sinkholes, agricultural or domestic well heads, or other conduits to surface waters, unless a 35-foot wide vegetated buffer or physical barrier is substituted for the 100-foot setback or alternative conservation practices or field-specific conditions will provide pollutant reductions equivalent or better than the reductions achieved by the 100-foot setback.

**D.    GROUNDWATER LIMITATIONS**

1.   Discharge of waste at existing milk cow dairies shall not cause the underlying groundwater to be further degraded, to exceed water quality objectives, unreasonably affect beneficial uses, or cause a condition of pollution or nuisance.  The appropriate water quality objectives are summarized in the Information Sheet, which is attached to and part of this Order, and can be found in the Central Valley Water Board's Water Quality Control Plan for the Sacramento and San Joaquin River Basins (4th Ed.) and the Water Quality Control Plan for the Tulare Lake Basin (2nd Ed.).

**E.    PROVISIONS**

1.   The Discharger shall comply with the *Standard Provisions and Reporting Requirements for Waste Discharge Requirements General Order No._____ for Existing Milk Cow Dairies* (Standard Provisions) dated **[date of adoption of Order]**, which is attached to and made part of this Order.

2.   The Discharger shall comply with all applicable provisions of the California Water Code, Title 27 CCR, and the applicable Water Quality Control Plans.

3.   The Discharger shall comply with the attached Monitoring and Reporting Program No. ____which is part of this Order, and future revisions thereto or with an individual monitoring and reporting program, as specified by the Central Valley Water Board or the Executive Officer.

4.   The Discharger shall submit a complete Report of Waste Discharge in accordance with the California Water Code Section 13260 at least 140 days prior to any material change or proposed change in the character, location, or volume of the discharge, including any expansion of the facility or development of any treatment technology, or construction of an anaerobic digester.





5.   If the Preliminary Dairy Facility Assessment (PDFA)[5] indicates that facility improvements are necessary (see Required Reports and Notices H.2.c), the Discharger shall make continual facility improvements while completing implementation of the Waste Management Plan and/or Nutrient Management Plan.

6.   This Order does not apply to facilities where wastes such as, but not limited to, whey, cannery wastes, septage, sludge, biosolids, ash or similar types of waste are generated onsite or are proposed to be brought onto the dairy or associated croplands for the purpose of nutrient recycling or disposal.  The Discharger shall submit a complete Report of Waste Discharge and receive WDRs or a waste-specific waiver of WDRs from the Central Valley Water Board prior to receiving such waste.

7.   If site conditions threaten to violate General Specification B.1 or Prohibition A.2, the Discharger shall take immediate action to preclude the violation, documenting the condition and all corrective actions.  Such actions shall be summarized in the annual monitoring report.  Alterations of the Waste Management Plan (see Required Reports and Notices H.2.a) for the production area to avoid a recurrence shall be submitted as a modification to the Waste Management Plan.

8.   If a discharge of waste creates, or threatens to create, significant objectionable odors or nuisance odor and vector conditions, enforcement and/or revocation of coverage under this Order may result.

9.   The Discharger shall comply with all requirements of this Order and all terms, conditions, and limitations specified by the Executive Officer.

10.  Any instance of noncompliance with this Order constitutes a violation of the California Water Code and its regulations.  Such noncompliance is grounds for enforcement action, and/or termination of the authorization to discharge.

11.  Upon cessation of operations at the milk cow dairy facility, the Discharger must maintain coverage under this Order or a subsequent revision to this Order until all manure, process wastewater, and animal waste impacted soil, including soil within the retention pond(s), is disposed of or utilized in a manner which does not pose a threat to surface water or groundwater quality or create a condition of nuisance.  At least 90 days before ceasing operations, the Discharger must submit a closure plan that demonstrates proper disposal of all manure, process wastewater, and animal waste impacted soil.  The closure plan shall describe:

---

[5] The PDFA is required as part of the Existing Conditions Report (Attachment A).  The Monitoring and Reporting Program No. ___ requires annual updates of the PDFA.



    a.  Maximum concentrations of phosphorus, nitrate, ammonia, and total Kjeldahl nitrogen that can remain in soil at the facility which will be protective of both groundwater and surface water.

    b.  Laboratory analyses of phosphorus, nitrate, ammonia, and total Kjeldahl nitrogen in soils beneath all ponds, animal confinement areas, and manure and feed storage areas to determine the potential for a discharge of pollutants to surface water or groundwater;

    c.  The existing locations and approximate quantity of manure, process wastewater, and animal waste impacted soil to be treated, applied to the land application area, or removed from the facility in order to eliminate the potential for a discharge of pollutants to surface water or groundwater;

    d.  The destination of any materials to be removed from the facility and documentation that the destination is approved to accept the materials;

    e.  The method used to treat or land apply any material remaining at the facility;

    f.  The method(s) to be used to control the discharge of pollutants from the facility;

    g.  Any limitations on future land or water uses created as a result of the facility's operations or closure activities;

    h.  A schedule for implementation of the closure plan; and

    i.  Any other relevant information the Executive Officer determines to be necessary.

12.  No more than 30 days after completion of site closure, the Discharger shall submit a closure report which documents that all closure activities were completed as proposed and approved in the closure plan.

13.  This Order shall become effective upon adoption by the Central Valley Water Board.

14.  The Discharger must comply with all conditions of this Order, including timely submittal of technical and monitoring reports as directed by the Executive Officer. Accordingly, the Discharger shall submit to the Central Valley Water Board on or before each report due date the specified document or, if an action is specified, a written report detailing evidence of compliance with the task. If noncompliance is being reported, the reasons for such noncompliance shall be stated, plus an estimate of the date when the Discharger will be in compliance. The Discharger shall notify the Central Valley Water Board by letter when it returns to compliance with the time schedule. Violations may result in enforcement action, including Central Valley Water Board or court orders requiring corrective action or imposing civil monetary liability, or in terminating the applicability of this Order to a specific facility or Discharger.



15.  Technical reports (Monitoring Well Installation and Sampling Plan, Monitoring Well
     Installation Completion Report, Groundwater Monitoring Report, Waste Management Plan
     Certification, and portions of the Waste Management Plan) required by this Order must be
     certified by an appropriately licensed professional as required in this Order and its
     Attachments (see Schedule of Tasks J.1 below).   If the Executive Officer provides
     comments on any technical report, the Discharger will be required to address those
     comments.

16.  The Discharger shall maintain a copy of this Order at the site so as to be available at all
     times to site-operating personnel.  The Discharger, landowner and his/her designee shall be
     familiar with the content of this Order.

**F.    EFFECTIVE DATE OF COVERAGE UNDER THIS ORDER**

1.   Coverage under this Order is effective upon notification by the Executive Officer that this
     Order applies to the Discharger.

**G.    PERMIT REOPENING, REVISION, REVOCATION, AND RE-ISSUANCE**

1.   If more stringent applicable water quality standards are adopted in the Basin Plans, the
     Central Valley Water Board may revise and modify this Order in accordance with such
     standards.

2.   This Order may be reopened to address any changes in state plans, policies, or regulations
     that would affect the water quality requirements for the discharges and as authorized by
     state law.

3.   The Central Valley Water Board or the Executive Officer may revoke coverage under this
     Order at any time and require the Discharger to submit a Report of Waste Discharge and
     obtain individual waste discharge requirements.

**H.    REQUIRED REPORTS AND NOTICES**

1.   Dischargers must submit documentation from a trained professional that no cross
     connections exist between the waste management system and any water supply or irrigation
     well that would ensure compliance with Prohibition A.14.  A trained professional could be
     a person certified by the American Backflow Prevention Association, an inspector from a
     state or local governmental agency who has experience and/or training in backflow
     prevention, or a consultant with such experience and/or training.  Documentation shall be
     supplied as part of the required Waste Management Plan (Item VI in Attachment B) and in
     accordance with the Schedule of Tasks in J.1.

2.     Dischargers must submit the following in accordance with the Schedule of Tasks J.1:



a.  **Existing Conditions Report**:  The Discharger shall submit an Existing Conditions
Report for the dairy facility, prepared in accordance with Attachment A.  The Existing
Conditions Report shall provide additional information on existing conditions at the
dairy that was not provided in the Report of Waste Discharge submitted in response to
the Central Valley Water Board's 8 August 2005 request.  The Existing Conditions
Report requires the Discharger to complete a Preliminary Dairy Facility Assessment.
The Preliminary Dairy Facility Assessment is available on the Central Valley Water
Board's web site at
http://www.waterboards.ca.gov/centralvalley/available_documents/index.html#confine
d and must be completed electronically.  The Discharger shall include a copy of the
results of the Preliminary Dairy Facility Assessment in the Existing Conditions Report.
Monitoring and Reporting Program No. ___ requires the Discharger to include an
updated Preliminary Dairy Facility Assessment in each Annual Report.

b.  **Waste Management Plan:**  The Discharger shall submit a Waste Management Plan for
the production area of the dairy facility, prepared in accordance with Attachment B.
The Waste Management Plan shall provide an evaluation of the existing milk cow
dairy's design, construction, operation, and maintenance for flood protection and waste
containment and whether the facility complies with General Specifications B.1 through
B.4 and B.6 through B.14.  If the design, construction, operation, and/or maintenance of
the dairy facility does not comply, the Waste Management Plan must propose
modifications and a schedule for modifications that will bring the dairy facility into
compliance.   Certification that the modifications have been implemented shall be
submitted in accordance with the Schedule of Tasks J.1.

c.  **Nutrient Management Plan:**  A Discharger who applies manure, bedding, or process
wastewater, and/or provides process wastewater to a third party for application, to land
for nutrient recycling must develop and implement management practices that control
nutrient losses and describe these in a Nutrient Management Plan.  The Nutrient
Management Plan must be certified as specified in Attachment C, maintained at the
dairy, submitted to the Executive Officer upon request and must ultimately provide for
protection of both surface water and groundwater. Certification that the Nutrient
Management Plan has been completed shall be in accordance with the Schedule of
Tasks J.1, shall incorporate the elements specified in Attachment C based on a field-
specific assessment of the potential for pollutant transport to surface water and
groundwater, and shall be submitted to the Executive Officer.  The Nutrient
Management Plan shall be updated as specified in the Technical Standards for Nutrient
Management in Attachment C or if the Executive Officer requests that additional
information be included.  Groundwater monitoring will be used to determine if
implementation of the Nutrient Management Plan is protective of groundwater quality.

d.  **Proposed Interim Facility Modifications**:  A Discharger whose Preliminary Dairy
Facility Assessment (see Required Reports and Notices H.2.a above) shows that the

Whole Farm Nitrogen Balance[6] is greater than 1.5 and/or that the existing retention pond(s) total storage capacity is less than the total storage capacity required shall submit Proposed Interim Facility Modifications as Necessary to Balance Nitrogen and/or Proposed Interim Facility Modifications as Necessary to Improve Storage Capacity, respectively.  Such Dischargers shall also submit a Status Report on the Interim Facility Modifications and Documentation of Interim Facility Modifications Completion as Necessary for Storage Capacity and to Balance N.

e.  **Salinity Report**:  The Discharger shall submit a report that identifies sources of salt in waste generated at the dairy, evaluates measures that can be taken to minimize salt in the dairy waste, and includes a commitment to implement measures identified to minimize salt in the dairy waste.  If a third party (for example, the California Dairy Quality Assurance Program) produces an industry-wide report that is acceptable to the Executive Officer, the Discharger may refer to that report rather than generating his own report, but must certify that the appropriate measures will be implemented to reduce salt in his dairy waste.

3.  Reporting Provisions:

a.  All Reports of Waste Discharge, applications, annual reports, or information submitted to the Central Valley Water Board shall be signed and certified in accordance with C. 7 and C.8 of the Standard Provisions.

b.  The Discharger shall submit all reports as specified in the attached Monitoring and Reporting Program No.____.

c.  Any Discharger authorized to discharge waste under this Order shall furnish, within a reasonable time, any information the Central Valley Water Board may request, to determine whether cause exists for modifying, revoking, and reissuing, or terminating their authorization for coverage under this Order. The Discharger shall, upon request, also furnish to the Central Valley Water Board copies of records required to be kept by this Order.

d.  All reports prepared and submitted to the Executive Officer in accordance with the terms of this Order shall be available for public inspection at the offices of the Regional Water Quality Control Board.

## I.  RECORD-KEEPING REQUIREMENTS

1.  The Discharger shall create, maintain for five years, and make available to the Central Valley Water Board upon request by the Executive Officer any reports or records required

---

[6] The Whole Farm Nitrogen Balance is to be determined as the ratio of (Nitrogen generated + Nitrogen imported)/(Nitrogen Removed by Crops and Exported) as reported in the Preliminary Dairy Facility Assessment in the Existing Conditions Report (Attachment A).

Waste Discharge Requirements General Order No.____                                      22
Existing Milk Cow Dairies

by this Order including those required under Monitoring and Reporting Program No. _____.

**J.     SCHEDULE OF TASKS**

1.     Dischargers who receive coverage under this Order are required to develop and implement a Waste Management Plan and Nutrient Management Plan and submit an Existing Conditions Report, Proposed Interim Facility Modifications, and a Salinity Report according to the schedule shown in Table 1.  All elements of the Waste Management Plan shall be submitted to the Executive Officer by the deadlines specified in Table 1 and signed and certified by the Discharger as required in Required Reports and Notices H.3.a above and the additional professional specified in Table 1.  For the elements of the Nutrient Management Plan, Dischargers shall submit a statement to the Executive Officer by each of the deadlines that the item due has been completed.  All statements must be signed and certified by the Discharger as required in Required Reports and Notices H.3.a above and the additional professional specified in Table 1.

2.     If changes are made to the required submittals through Central Valley Water Board or Executive Officer review, those changes shall be implemented.

3.     Any Discharger may be requested to complete the Nutrient Management Plan and/or Waste Management Plan prior to the due date identified in Table 1 if the Executive Officer has determined the facility presents a significant risk to groundwater or surface water.


        I, PAMELA C. CREEDON, Executive Officer, do hereby certify that the foregoing is a full, true, and correct copy of an Order adopted by the California Regional Water Quality Control Board, Central Valley Region, on _____.


                                        _____
                                        PAMELA C. CREEDON, Executive Officer

EXHIBIT 2

CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
CENTRAL VALLEY REGION

MONITORING AND REPORTING PROGRAM NO._____

GENERAL ORDER
FOR
EXISTING MILK COW DAIRIES

This Monitoring and Reporting Program (MRP) is issued pursuant to California Water Code
(CWC) Section 13267.  The Discharger shall not implement any changes to this MRP unless a
revised MRP is issued by the Executive Officer.

This MRP requires monitoring of discharges of manure and/or process wastewater, storm water,
and tailwater from the production area and land application area and groundwater monitoring in
order to determine if the Discharger's dairy is in compliance with the discharge limitations of
Waste Discharge Requirements General Order No. _____ (Order).   Discharge monitoring should
be infrequent for those dairies that are operating in compliance with the Order.

The MRP also requires periodic visual inspections of the dairy to ensure the dairy is being
operated and maintained to ensure continued compliance with the Order.  In addition, the MRP
requires monitoring of nutrients applied to, and removed from, land application areas in order for
the Discharger to develop and implement a Nutrient Management Plan that will minimize
leaching of nutrients and salts to groundwater and transport of these constituents to surface
water.

The Discharger shall conduct monitoring and reporting as specified below.

A.   **MONITORING PROVISIONS**

### Inspections

The results of inspections described below shall be recorded and the records shall be
maintained on-site for a period of five years.

1.   The Discharger shall inspect the production area weekly including all waste storage
areas and note any conditions or changes that could result in discharges to surface
waters and/or from property under the control of the Discharger.

2.   During and after each significant storm event[1], the Discharger shall make visual
inspections of storm water containment structures.  These structures shall be
inspected for discharge, freeboard, berm integrity, cracking, slumping, erosion,
excess vegetation, animal burrows, and seepage.

---

[1] A significant storm event is defined as a storm event that results in continuous runoff of storm water for a minimum of one
hour, or intermittent runoff for a minimum of three hours in a 12-hour period.

11/22/06

3.   Freeboard shall be measured weekly within each liquid manure storage structure using a depth marker.  Freeboard shall be the vertical distance from the pond surface to the lowest elevation of the surrounding berm or the bottom of the spillway and shall be measured to the nearest 0.25 foot (3 inches).

4.   The Discharger shall inspect land application areas immediately prior to commencement of application of process wastewater and daily when process wastewater is being applied and note: the conditions of the land application area berms including rodent holes, piping, and bank erosion; the presence (or lack) of field saturation, ponding, erosion, runoff (including tailwater discharges from the end of fields, pipes, or other conveyances), and nuisance conditions; and the conditions of any vegetated buffers or alternative conservation practices.

**Manure and Process Wastewater Monitoring**

5.   The Discharger shall monitor process wastewater and manure produced at the facility. This monitoring is for nutrient management and is expected to be part of the Nutrient Management Plan.  Monitoring shall be performed to determine the nutrient and salt content of process wastewater and manure separately.  Monitoring results shall be included in the Annual Monitoring Report (see Reporting Requirements B.2.n).

   a.   Manure composite samples shall be collected and analyzed as specified in Monitoring Provisions A.25 and A.35 below, respectively.  Manure shall be monitored for parameters 1 (volume or weight) and 21 (moisture content/wet weight) or 22 (density) each time applied to land under the Discharger's control or exported offsite, and at least quarterly for parameters 2, 7, 8, 10, and 11 in Table 1.  The total dry weight (tons) of manure applied annually to the land application area shall be recorded for each field.

   b.   Process wastewater composite samples shall be collected and analyzed as specified in Monitoring Provisions A.26 and A.36 below, respectively. Monitoring of process wastewater shall include, at a minimum, parameters 1, 2, 6, 7, 8, 10, and 11 in Table 1.  Parameters 2, 6, 7, 8, 10, and 11 shall be monitored to determine the nutrient application to the land application area during at least one irrigation event each quarter (every three months) in which the process wastewater is applied to the land application area(s).  Monitoring of nitrate-nitrogen (parameter 6) is only required if the retention pond is aerated. General minerals (parameter 13) shall be monitored when groundwater monitoring is required and at the frequency to be specified in the Monitoring Well Installation and Sampling Plan (MWISP).  The volume (parameter 1) of process wastewater applied shall be measured to gauge the hydraulic application to the land application area during each irrigation event for each field.  The process wastewater application dates and total gallons or acre-inches of process wastewater applied to each field shall be recorded for each application.

11/22/06

**Irrigation Water and Water Use Monitoring**

6.     The Discharger shall monitor irrigation water that is used on all land application areas under the Discharger's control where manure and/or process wastewater is applied and shall assure monitoring of irrigation water when the irrigation is conducted where the Discharger's process wastewater is applied under a third party's control.   The Discharger shall also monitor rainfall and crop water use at the dairy using information from the nearest California Irrigation Management Information System (CIMIS) weather station.  Crop water use shall be determined using data on evapotranspiration from a standardized grass surface (ETo) from the CIMIS station and the crop coefficient method (University of California Cooperative Extension Publications 21427 and 21428 available at http://www.cimis.water.ca.gov/cimis/infoEtoCropCo.jsp) or equivalent procedure. This monitoring is for nutrient management and is expected to be part of the Nutrient Management Plan.  Irrigation water shall be sampled at least two times during the irrigation season as follows:

     a.     At a minimum, one sample shall be collected at the beginning and another sample shall be collected at the end of the irrigation season during actual irrigation events.

     b.     Canal and well water sources shall be considered separate supplies, each requiring sampling two times during actual irrigation events.

     c.     Monthly samples shall be collected from canals during actual irrigation events if the canal is subject to water quality variations due to changes in supply water sources.

7.     Irrigation water samples shall be collected and analyzed as specified in Monitoring Provisions A.27 and A.36 below, respectively.  Irrigation water shall be monitored for parameters 1, 2, 6, 7, 8, 10, and 11 in Table 1.  The dates and volume (parameter 1) of each irrigation application shall be monitored and recorded for each land application area.  Daily rainfall (parameter 23) and crop water use (parameter 24) shall also be recorded.

**Soil Monitoring**

8.     At least once every five years, commencing with the first full calendar year regulated by the Order, the Discharger shall collect and analyze representative soil samples for parameters 2, 6, 7, 9, 10, and 11 in Table 1 from all land application areas under the Discharger's control where process wastewater and/or manure is applied and shall assure that soil is analyzed where the Discharger's process wastewater is applied under a third party's control.  Soil samples shall be collected following harvest of a crop and before nutrients are added for the following crop as specified in Monitoring Provision A.28 and analyzed as specified in Monitoring Provisions A.33 and A.34

below. The results of these analyses are to be used in determining application rates of manure and process wastewater to the land application area and are expected to be part of the Nutrient Management Plan.  Monitoring results shall be included in the Annual Monitoring Report (see Reporting Requirements B.2.n).

**Plant Tissue Monitoring**

9.      The Discharger shall monitor plant tissue (1) at harvest to determine the nutrients removed from each land application area where manure and/or process wastewater is applied and (2) if necessary, mid-season to assess the need for additional nitrogen and/or phosphorus fertilizer during the growing season.  The total weight (tons) and wet weight (parameter 21) or the volume (cubic yards) and density (parameter 22) of the harvested material which is removed from each land application area shall be determined and recorded.  Plant tissue samples shall be collected and analyzed as specified in Monitoring Provisions A.29 and A.33 below, respectively.  Plant tissue samples shall be monitored for parameters 9, 10, 11, and 21 (or 22) in Table 1.

**Discharge and Surface Water Monitoring**

10.     The Discharger shall record the date and the approximate time and volume of each off-property discharge of wastes from the production area or land application area and the approximate duration and amount of wastes discharged.  Such discharges shall be reported in accordance with Reporting Requirement B.1, B.2.h, or B.2.j  below as appropriate.

11.     The Discharger shall record the date and the approximate time and volume of each discharge of storm water from the production area to surface water and the approximate duration of the discharge.  Such discharge shall be reported in accordance with Reporting Requirements B.1 and B.2.i.

12.     During or immediately after any overflow or other unauthorized discharge of storm water to surface water or wastewater from a manure or process wastewater storage area, retention pond, corral or land application area, the Discharger shall collect samples of the discharge.  If the discharge is to surface water, the Discharger shall also collect samples from surface water upstream[2] and downstream[3] of the discharge.  The Discharger shall record the estimated volume of the discharge and the date and time of the discharge.  Discharges and surface water shall be monitored daily during each discharge event for parameters 2 through 8, 10 through 12, 14, 15, 18, and 19 in Table 1.  Discharges shall also be monitored daily for volume (parameter 1).  The results of such monitoring shall be reported in accordance with Reporting Requirements B.1 and B.2.m.

---

[2] Upstream samples shall be taken just far enough upstream so as not to be influenced by the discharge.
[3] Downstream samples shall be taken just far enough downstream where the discharge is blended with the receiving water but not influenced by dilution flows or other discharges.

Note:  If conditions are not safe for sampling, the Discharger must provide documentation of why samples could not be collected and analyzed.  For example, the Discharger may be unable to collect samples during dangerous weather conditions (such as local flooding, high winds, tornados, electrical storms, etc.).  However, once the dangerous conditions have passed, the Discharger shall collect a sample of the discharge or, if the discharge has ceased, from the waste management unit from which the discharge occurred.

### Tailwater Monitoring

13.   The Discharger shall monitor and record each discharge of tailwater to surface water, at the point of discharge, from any land application area where irrigation has occurred less than 60 days after application of manure and/or process wastewater to that area. A map showing the sample locations, and the method of measuring the flow must be provided in the Annual Report (see Reporting Requirement B.2.j below).  Samples of discharges shall be analyzed as specified in Monitoring Provision A.36 below.  Each discharge shall be monitored during each event at the point of discharge for parameters 1 through 8, 10, 11, 14, 15, 18, and 19 in Table 1.  Each discharge shall be monitored daily at the point of discharge for total dissolved solids (parameter 12). The results of all tailwater monitoring shall be reported in accordance with Reporting Requirements B.2.j and B.2.m below.

### Storm Water Monitoring

14.   During the first twelve months following enrollment under the Order, the Discharger shall monitor discharges of storm water to surface water from each separate land application area that is identified in Item 1.A (See Attachment C) of the Discharger's Nutrient Management Plan.  The monitoring shall include the following:

   a.   Collection and analysis of grab samples from at least two storm events per wet season.  The first sample shall be from the first storm event of the wet season that produces significant storm water discharge (continuous storm water runoff for a minimum of one hour, or intermittent storm water runoff for a minimum of three hours in a 12-hour period) and the second from a storm event that produces significant storm water discharge during the peak storm season (typically February) and that is preceded by at least three days of dry weather. The sample(s) should be taken during the first hour of the discharge.  The samples shall be monitored for parameters 1, 2, 3, 4, 5, 6, 7, 8, 12, 14, 18, 19, and 20 in Table 1.  The samples shall be analyzed as specified in Monitoring Provision A.36 below.

   b.   Sample locations must be chosen such that the samples are representative of the quality and quantity of storm water discharged.  A rationale for the sample locations, a map showing the sample locations, and the method of measuring the

storm water flow must be provided in the Annual Storm Water Monitoring Report (see Reporting Requirements B.4 below).

Documentation must be provided in the annual storm water monitoring report (required in the Reporting Requirements B.4 below) if no significant discharges of storm water from any of the land application areas occur, or if the Discharger is unable to collect any of the required samples due to adverse climatic conditions and/or inaccessibility to the discharge location.

If the Executive Officer does not approve reducing the constituents and/or sampling frequency for any land application area based on the first year of storm water monitoring report (see Reporting Requirements B.5 below), the Discharger shall continue the storm water monitoring in accordance with the requirements above.

### Groundwater Monitoring

The Discharger must sample each domestic and agricultural supply well and subsurface (tile) drainage system present in the production and/or land application areas to characterize existing groundwater quality. The Executive Officer will use groundwater monitoring data from four quarters of monitoring events and additional information to assess and determine the need for additional groundwater monitoring at a facility. Groundwater monitoring data together with factors in Table 2 of this Monitoring and Reporting Program will be used as a guide to prioritize where and when monitoring wells are to be installed. The Discharger must comply with the groundwater monitoring requirements below:

15. The Discharger shall immediately begin sampling each domestic and agricultural supply well present in the production and land application areas. These wells shall be sampled quarterly for parameters 6, 7, and 12 in Table 1. Monitoring of the supply wells may be reduced to annually after one year of quarterly data are provided to the Executive Officer or may continue at the same frequency if directed by the Executive Officer.

16. The Discharger shall immediately begin sampling discharges from each subsurface (tile) drainage system present in the land application area(s) quarterly for parameters 6, 7, and 12 in Table 1.

### Additional Groundwater Monitoring Requirements

17. When required by the Executive Officer, the Discharger shall install sufficient monitoring wells to:

    a.   Characterize groundwater flow direction and gradient beneath the site;



b.   Characterize natural background (unaffected by the Discharger or others) groundwater quality upgradient of the facility; and

c.   Characterize groundwater quality downgradient of the corrals, downgradient of the retention ponds, and downgradient of the land application areas.

It may be necessary to install more than one upgradient monitoring well (i.e., for the production area and the land application area). The Executive Officer may require more extensive monitoring based on site-specific conditions. The Executive Officer will prioritize installation of monitoring wells based on the factors identified in Table 2.

18.   Prior to installation of monitoring wells, the Discharger shall submit to the Executive Officer a Monitoring Well Installation and Sampling Plan (MWISP) (see Attachment G) and schedule prepared under the direct supervision of, and certified by, a California registered civil engineer or a California registered geologist with experience in hydrogeology. Installation of monitoring wells shall not begin until the Executive Officer notifies the Discharger in writing that the MWISP is acceptable.

19.   All monitoring wells shall be constructed in a manner that maintains the integrity of the monitoring well bore hole and prevents the well from acting as a conduit for pollutant/contaminant transport. The sampling interval of each monitoring well shall be appropriately screened and fitted with an appropriate filter pack to enable collection of representative groundwater samples of the first encountered groundwater.

20.   The construction and destruction of monitoring wells and supply wells shall be in accordance with the standards under *Water Wells* and *Monitoring Wells* in the *California Well Standards Bulletin 74-90 (June 1991)* and *Bulletin 74-81 (December 1981),* adopted by the Department of Water Resources (DWR). Should any county or local agency adopt more stringent standards than that adopted by the DWR, then these local standards shall supercede the Well Standard of DWR, and the Discharger shall comply with the more stringent standards.

21.   The horizontal and vertical position of each monitoring well shall be determined by a registered land surveyor or other qualified professional. The horizontal position of each monitoring well shall be measured with one-foot lateral accuracy using the North American Datum 1983 (NAD83 datum). The vertical elevations of each monitoring well shall be referenced to the North American Vertical Datum 1988 (NAVD88 datum) to an absolute accuracy of at least 0.5 feet and a relative accuracy between monitoring wells of 0.01 feet.

22.   Within 45 days after completion of any monitoring well, the Discharger shall submit to the Executive Officer a Monitoring Well Installation Completion Report (MWICR) (see Attachment G) prepared under the direct supervision of, and certified by, a

California registered civil engineer or a California registered geologist with experience in hydrogeology.

23. The Discharger shall sample monitoring wells quarterly for one year to establish background concentrations. Groundwater monitoring may be reduced to semi-annually once one year of quarterly groundwater monitoring data are provided to the Executive Officer. Groundwater monitoring shall include monitoring during periods of the expected highest and lowest water table levels. Groundwater monitoring shall include:

    a. Measurement of the depth to groundwater from a surveyed reference point to the nearest 0.010 foot in each monitoring well; and

    b. Analysis of groundwater samples from each well as specified in Monitoring Provision A. 36 below, for parameters 2, 5, 6, 7, 8, 10, 11, 12, and 13 in Table 1.

24. The Discharger shall submit to the Executive officer an evaluation of the groundwater monitoring data within six months of obtaining sufficient data to evaluate trends in the data (usually about 8 independent samples). The submittal shall include a description of the statistical or non-statistical methods proposed for use in evaluating the groundwater monitoring data. The proposed methods must be approved by the Executive Officer

### Sampling Requirements

The Discharger shall use sample containers and sample handling, storage, and preservation methods that are accepted or recommended by the selected analytical laboratory or, as appropriate, in accordance with approved United States Environmental Protection Agency analytical methods. The following sampling procedures are standards currently recognized by the Central Valley Water Board. When special procedures appear to be necessary at an individual dairy, the Discharger may request approval of alternative sampling procedures for nutrient management. The Executive Officer will review such requests and if adequate justification is provided, may approve the requested alternative sampling procedures.

25. Manure samples shall be collected as follows:

    a. At least 10 equal-size samples of manure shall be collected from various portions of the manure pile, with most samples from the center. No more than two samples shall be collected from the surface and two from the bottom.

    b. The 10 samples shall be placed in a container and mixed well before a subsample is placed in a clean container provided by or approved by the analytical laboratory that will receive the samples.



    c.     Sample containers that are reused shall be washed with soap and thoroughly rinsed with clean (tap) water.

26.   Process wastewater composite samples shall be collected as follows:

    a.     A representative composite sample of process wastewater shall be prepared based on a minimum of three time-series samples collected during an irrigation event that are representative of the beginning, middle, and end of the process wastewater discharge.  These samples shall be combined in a single container, mixed, and poured into a clean container provided by or approved by the laboratory that will receive the samples.  Containers that are reused shall be washed with soap and thoroughly rinsed with clean (tap) water.

    b.     The samples shall be collected at a point that is prior to any dilution or blending with irrigation water and shall be representative of the process wastewater applied to the land application area.

27.   Irrigation water samples shall be collected as follows:

    a.   Samples shall be collected before the addition of process wastewater.

    b.   Samples from irrigation wells shall be collected after the pump has run for a minimum of 30 minutes or after at least three well volumes have been purged from the well.

28.   Soil samples shall be collected as follows:

    a.   Composite samples shall be collected from each land application area receiving manure and/or process wastewater.  Samples shall be composited by:

        i.   Placing equal volumes of soil from each of 10 or more sample sites for each land application area and sample depth, in a clean plastic bucket.  Moist soils may be air dried until they can be mixed easily.

        ii.   Thoroughly mixing the sample and placing at least one pint of the composite sample in a clean plastic container to be shipped to the laboratory.  The laboratory should be consulted for the exact amount of sample and the sample container needed

    b.   At a minimum, composite samples shall be collected from a depth of 0 to 48 inches.   Samples from each site shall be split into four sections representing depth intervals 0 to 12 inches, 12 to 24 inches, 24 to 36 inches, and 36 to 48 inches.  All samples from the same depth interval for all sites within each land application area shall be composited for analyses.



     c.    Soil samples shall be collected with soil probes or augers from a minimum of 10 sites in each land application area and composited as described below.

          i.  At least three of the 10 samples shall be from the upper third of the land application area.

          ii.  In fields where soil texture, crop yield, or other soil-related factors vary, at least 10 samples shall be collected from each different area and composites from each area shall be analyzed separately.

          iii.  Sample locations in each land application area shall be recorded on a sketch for future sampling consistency.

          iv.  Soil probes or augers shall be cleaned thoroughly between selected sample depth intervals with a non-residual detergent such as Alconox.

29.   Plant tissue samples shall be collected as follows.

     a.    Harvest plant tissue samples shall be collected as follows:

          i.  At least 10 equal-size samples (for example, using a two- to three-pound coffee can) of the harvested portion of the crop shall be collected as the material is moved off of the field.  These samples shall be combined and thoroughly mixed in a plastic bag, taking care not to allow drying.

          ii.  Samples shall be contained in sealed plastic bags to retain moisture content.

     b.    Mid-season plant tissue samples, if collected, shall be collected following University of California recommendations for the specific plant being tested.

30.   Samples of discharges, surface water, tailwater, and storm water shall be collected as specified above in Monitoring Requirements A.10 through A.14.

31.   Groundwater samples from monitoring wells shall be collected as specified in an approved Monitoring Well Installation and Sampling Plan.

32.   Groundwater samples from domestic wells shall be collected from the tap nearest to the pressure tank (and before the pressure tank if possible) after water has been pumped from this tap for 10 to 20 minutes.  Groundwater samples from agricultural supply wells shall be collected after the pump has run for a minimum of 30 minutes or after at least three well volumes have been purged from the well.

11

## Analytical Requirements

33. Analyses of soil and plant tissue samples shall be conducted by: methods utilized by the North American Proficiency Testing (NAPT) Program or accepted by the University of California; and laboratories participating in the NAPT Program or other programs whose tests are accepted by the University of California.  This shall include analysis for nitrate-nitrogen and ammonium-nitrogen utilizing the 1M potassium chloride extract of soil.

34. Analyses of phosphorus in soil samples shall be performed using the method recommended by the University of California or the bicarbonate-P or Olsen_P test.

35. Analyses of manure shall be conducted by: methods utilized by the Manure Analyses Proficiency (MAP) Testing Program or accepted by the University of California; and laboratories participating in the MAP Testing Program or other programs whose tests are accepted by the University of California.

36. Analyses of process wastewater, irrigation water, tailwater, discharges, surface water, storm water, and groundwater samples shall be conducted by a laboratory certified for such analyses by the California Department of Health Services.  These laboratory analyses shall be conducted in accordance with the Title 40 Code of Federal Regulations Part 136 (*Guidelines Establishing Test Procedures for the Analysis of Pollutants*) or other test methods approved by the Executive Officer.

## Record-Keeping Requirements

37. Dischargers shall maintain on-site for a period of five years from the date they are created all information as follows:

   a. All information necessary to document implementation and management of the minimum elements of the nutrient management plan (NMP);

   b. All records for the production area including;

      i. Records documenting the inspections required under Monitoring Provisions A.1, A.2, and A.3 above.

      ii. Records documenting any corrective actions taken to correct deficiencies noted as a result of the inspections required in Monitoring Provisions A.1, A.2, and A.3 above.   Deficiencies not corrected in 30 days must be accompanied by an explanation of the factors preventing immediate correction;

      iii. Records of the date, time, and estimated volume of any overflow;

iv.     Records of mortality management and practices;

v.      Steps and dates when action is taken to correct unauthorized releases as reported in accordance with Reporting Requirement B.1 below; and

vi.     Records of monitoring activities and laboratory analyses conducted as required in Standard Provisions and Reporting Requirements D.5.

c.   All records for the land application area including:

i.      Expected and actual crop yields;

ii.     Identification of crop, acreage, and dates of planting and harvest for each field;

iii.    Dates, locations, and approximate weight and moisture content, or volume and density, of manure applied to each field;

iv.     Dates, locations, and volume of process wastewater applied to each field;

v.      Weather conditions at time of manure and process wastewater applications and for 24 hours prior to and following applications;

vi.     Records documenting the inspections conducted required under Monitoring and Reporting Provisions A.4 above;

vii.    Dates, locations, and test methods for soil, manure, process wastewater, irrigation water, and plant tissue sampling;

viii.   Results from manure, process wastewater, irrigation water, soil, plant tissue, discharge (including tailwater), and storm water sampling;

ix.     Explanation for the basis for determining manure or process wastewater application rates, as provided in the Technical Standards for Nutrient Management established by the Order (Attachment C);

x.      Calculations showing the total nitrogen, phosphorus, and potassium to be applied to each field, including sources other than manure or process wastewater;

xi.     Total amount of nitrogen, phosphorus, and potassium actually applied to each field, including documentation of calculations for the total amount applied;

xii.    The method(s) used to apply manure and/or process wastewater;


    xiii.  Dates of manure and/or process wastewater application equipment inspections; and

    xiv.  Records documenting any corrective actions taken to correct deficiencies noted as a result of the inspections required in Monitoring Provisions A.4 above. Deficiencies not corrected in 30 days must be accompanied by an explanation of the factors preventing immediate correction.

    xv.  Records of monitoring activities and laboratory analyses conducted as required in Standard Provisions and Reporting Requirements D.5.

d.    A copy of the Discharger's site-specific NMP;

e.    All Manure/Process Wastewater Tracking Manifest forms (Attachment D) which includes information on the manure hauler, destination of the manure, dates hauled, amount hauled, and certification; and

f.    All analyses of manure, process wastewater, irrigation water, soil, plant tissue, discharges (including tailwater discharges), surface water, storm water, and groundwater.

## General Monitoring Requirements

38.  The Discharger shall comply with all the "Requirements Specifically for Monitoring Programs and Monitoring Reports" as specified in the Standard Provisions and Reporting Requirements.

39.  All samples collected shall be representative of the volume and nature of the material being sampled.

40.  All samples containers shall be labeled and records maintained to show the time and date of collection as well as the person collecting the sample and the sample location.

41.  All samples collected for laboratory analyses shall be preserved and submitted to the laboratory within the required holding time appropriate for the analytical method used and the constituents analyzed.

42.  All samples submitted to a laboratory for analyses shall be identified in a properly completed and signed Chain of Custody form.

43.  Field test instruments used for pH, electrical conductivity and dissolved oxygen may be used provided:

a.    The operator is trained in the proper use and maintenance of the instruments;

Monitoring and Reporting Program No. _____                                     14
General Order for Existing Milk Cow Dairies

       b.     The instruments are field calibrated prior to each monitoring event; and

       c.     Instruments are serviced and/or calibrated by the manufacturer at the
             recommended frequency.



11/22/06

Monitoring and Reporting Program No. _____
General Order for Existing Milk Cow Dairies

| TABLE 1.  MONITORING PARAMETERS | | | |
|---|---|---|---|
| **Parameter** | **Units** | | **Type of Analysis** |
| | **Liquid Materials[4]** | **Solid Materials[5]** | |
| 1.   Volume or Weight[6] | Gallons or Acre-inches | Tons | Field[7] |
| 2.   Electrical Conductivity | $\mu$mhos/cm[8] | $\mu$mhos/cm | Field/Laboratory[9] |
| 3.   Dissolved Oxygen | mg/l[10] | NA[11] | Field |
| 4.   Temperature | °F | NA | Field |
| 5.   pH | pH units | pH units | Field/Laboratory[12] |
| 6.   Nitrate-Nitrogen | mg/l | mg/kg[13] | Laboratory |
| 7.   Ammonium-Nitrogen/Total Ammonia-Nitrogen and Unionized Ammonia-Nitrogen[14] | mg/l | mg/kg | Laboratory |
| 8.   Total Kjeldahl Nitrogen | mg/l | mg/kg | Laboratory |
| 9.   Total Nitrogen | mg/l | mg/kg | Laboratory |
| 10.  Phosphorus[15] | mg/l | mg/kg | Laboratory |
| 11.  Potassium | mg/l | mg/kg | Laboratory |
| 12.  Total Dissolved Solids | mg/l | mg/kg | Laboratory |
| 13.  General Minerals[16] | mg/l | mg/kg | Laboratory |
| 14.  $BOD_5$[17] | mg/l | NA | Laboratory |
| 15.  Total Suspended Solids | mg/l | NA | Laboratory |
| 16.  Iron | mg/l | NA | Laboratory |
| 17.  Manganese | mg/l | NA | Laboratory |
| 18.  Total Coliform | MPN/100 ml[18] | NA | Laboratory |
| 19.  Fecal Coliform | MPN/100 ml | NA | Laboratory |
| 20.  Turbidity | NTU | NA | Laboratory |
| 21.  Moisture Content/Wet Weight[19] | NA | percent | Laboratory |
| 22.  Density[20] | NA | g/l[21] | Laboratory |
| 23.  Rainfall | inches[22] | NA | CIMIS[23] |
| 24.  Crop Water Use | inches | NA | CIMIS |

[4] Liquid materials include process wastewater, irrigation water, tailwater, storm water, and surface water.
[5] Solid materials include manure, soil, and plant tissue.
[6] Volume or weight of waste application or discharge.
[7] These parameters are to be measured in the field.
[8] Micromhos per centimeter ($\mu$mhos/cm).
[9] Electrical conductivity of: 1) liquid materials may be field measurements and 2) solid materials shall be laboratory measurements.
[10] Milligrams per liter (mg/l).
[11] NA – not applicable.
[12] pH shall be determined by laboratory analysis for soil and manure.  pH for all other types of samples may be by field measurements.
[13] Milligrams per kilogram (mg/kg).
[14] Samples of soil, manure, process wastewater, irrigation water, and groundwater shall be analyzed for ammonium-nitrogen. Samples of discharges of process wastewater, storm water, and tailwater to surface water and samples of surface water shall be analyzed for total ammonia-nitrogen and unionized ammonia-nitrogen.
[15] Samples of manure, process wastewater, irrigation water, groundwater, and discharges of process wastewater, storm water, and tailwater to surface water shall be analyzed for total phosphorus.  Samples of soil shall be analyzed for soluble phosphorus as required in A.34.
[16] General minerals include calcium, magnesium, sodium, bicarbonate, carbonate, sulfate, and chloride reported individually.
[17] Five-day Biochemical Oxygen Demand.
[18] Most probable number, five dilutions minimum.
[19] Manure shall be analyzed for moisture content (percent) when the amount of manure applied to a land application area or exported is expressed in weight (i.e., tons).  Plant tissue shall be analyzed for wet weight (percent) when the amount harvested is reported in weight (i.e., tons), but the constituent analyses expressed on a dry weight basis.
[20] Manure density shall be analyzed when the amount of manure applied to a land application area or exported is expressed in volume (i.e., cubic yards).  Plant density shall be analyzed when the amount harvested is expressed in volume (i.e., cubic yards).
[21] Grams per liter (g/l).
[22] Rainfall shall be reported to the nearest tenth of an inch.
[23] California Irrigation Management Information System (CIMIS) data from the nearest station..

Monitoring and Reporting Program No. _____     16
General Order for Existing Milk Cow Dairies

| TABLE 2.  GROUNDWATER MONITORING FACTORS FOR RANKING PRIORITY[24] | | | |
|---|---|---|---|
| **FACTOR** | **SITE CONDITION** | **POINTS** | **SCORE** |
| Highest nitrate concentration (nitrate-nitrogen in mg/l) in any existing domestic well, agricultural supply well, or tile drainage system at the dairy or associated land application area (detected two or more times in any one well or tile drainage system).* | < 10 | 0 | |
| | 10 - 20 | 10 | |
| | >20 | 20 | |
| Ammonium (ammonium-nitrogen in mg/l) detected twice at any concentration in any existing domestic well, agricultural supply well, or tile drainage system at the dairy or associated land application area.* | < detection limit[25] | 0 | |
| | ≥ detection limit | 20 | |
| Location of production area or land application area relative to a Department of Pesticide Groundwater Protection Area[26] (GWPA). | Outside GWPA | 0 | |
| | In GWPA | 20 | |
| Distance (feet) of production area or land application area from an artificial recharge area[27] as identified in the California Department of Water Resources Bulletin 118 or by the Executive Officer. | > 1,500 | 0 | |
| | 601 to 1,500 | 10 | |
| | 0 to 600 | 20 | |
| Nitrate concentration (nitrate-nitrogen in mg/l) in domestic well on property adjacent to the dairy production area or land application area (detected two or more times). | < 10 or unknown | 0 | |
| | 10 or greater | 20 | |
| Distance (feet) from dairy production area or land application area and the nearest off-property domestic well.* | > 600 | 0 | |
| | 301 to 600 | 10 | |
| | 0 to 300 | 20 | |
| Distance (feet) from dairy production area or land application area and the nearest off-property municipal well.* | > 1,500 | 0 | |
| | 601 to 1,500 | 10 | |
| | 0 to 600 | 20 | |
| Number of crops grown per year per field.* | 1 | 5 | |
| | 2 | 10 | |
| | 3 | 15 | |
| Nutrient Management Plan completed by **[24 months after adoption of the Order]**?* | Yes | 0 | |
| | No | 100 | |
| Whole Farm Nitrogen Balance.[28]* | <1.5 | 0 | |
| | 1.5 to 3 | 10 | |
| | >3 | 20 | |

**Total Score**: _____

*  This information will be provided by the Discharger.   All other information will be obtained by the Executive Officer.

[24] Information on each factor may not be available for each facility. Total scores will be the ratio of the points accumulated to the total points possible for each facility.  Dairies with higher total scores will be directed to install monitoring wells first.
[25] The detection limit for ammonium-nitrogen shall not exceed 1.5 mg/l.
[26] The Department of Pesticide Regulation (DPR) defines a Groundwater Protection Area (GWPA) as an area of land that is vulnerable to the movement of pesticides to groundwater according to either leaching or runoff processes.  These areas include areas where the depth to groundwater is 70 feet or less.  The DPR GWPAs can be seen on DPRs website at http://www.cdpr.ca.gov/docs/gwp/gwpamaps.htm.
[27] An artificial recharge area is defined as an area where the addition of water to an aquifer is by human activity, such as putting surface water into dug or constructed spreading basins or injecting water through wells.
[28] The Whole Farm Nitrogen Balance is to be determined as the ratio of (Nitrogen generated + Nitrogen imported)/(Nitrogen Removed by Crops and Exported) as reported in the Preliminary Dairy Facility Assessment in the Existing Conditions Report (Attachment A).

11/22/06

**B.      REPORTING REQUIREMENTS**

### Noncompliance Reporting

1.  The Discharger shall report any noncompliance that endangers human health or the environment or any noncompliance with Prohibitions A.1, A.2, A.3, A.4, A.5, A.8, A.9, A.10, A.11, and A.12 in the Order, within 24 hours of becoming aware of its occurrence. The incident shall be reported to the Central Valley Water Board Office, local environmental health department, and to the California Office of Emergency Services (OES).  During non-business hours, the Discharger shall leave a message on the Central Valley Water Board's voice mail. The message shall include the time, date, place, and nature of the noncompliance, the name and number of the reporting person, and shall be recorded in writing by the Discharger.  The OES is operational 24 hours a day. A written report shall be submitted to the Central Valley Water Board office within two weeks of the Discharger becoming aware of the incident. The report shall contain a description of the noncompliance, its causes, duration, and the actual or anticipated time for achieving compliance. The report shall include complete details of the steps that the Discharger has taken or intends to take, in order to prevent recurrence. All intentional or accidental spills shall be reported as required by this provision. The written submission shall contain:

    a.   The approximate date, time, and location of the noncompliance including a description of the ultimate destination of any unauthorized discharge and the flow path of such discharge to a receiving water body.

    b.   A description of the noncompliance and its cause;

    c.   The flow rate, volume, and duration of any discharge involved in the noncompliance;

    d.   The amount of precipitation (in inches) the day of any discharge and for each of the seven days preceding the discharge;

    e.   A description (location; date and time collected; field measurements of pH, temperature, dissolved oxygen and electrical conductivity; sample identification; date submitted to laboratory; analyses requested) of noncompliance discharge samples and/or surface water samples taken to comply with Monitoring Provision A.12;

    f.   The period of noncompliance, including dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue; and

    g.   A time schedule and a plan to implement corrective actions necessary to prevent the recurrence of such noncompliance.

The laboratory analyses of the noncompliance discharge sample and/or upstream and downstream surface water samples shall be submitted to the Central Valley Water Board office within 45 days of the discharge.

**Annual Reporting**

2.  An annual monitoring report covering the 12-month period beginning 1 November and ending 31 October of the following year shall be submitted to the Executive Officer by **[12 months after adoption of the Order] of each year**. The annual report shall be completed on an annual report form provided by the Executive Officer (available on the Central Valley Water Board website at http://www.waterboards.ca.gov/centralvalley/available_documents/index.html#confined) and shall include all the information as specified below.

   a.  An updated Preliminary Dairy Facility Assessment using the tool provided in Attachment A.

   b.  Number and type of animals, whether in open confinement or housed under roof;

   c.  Estimated amount of total manure (tons) and process wastewater (gallons or acre-inches) generated by the facility in the previous 12 months;

   d.  Estimated amount of total manure (tons) and process wastewater (gallons or acre-inches) applied over the previous 12 months to each land application area identified in 3.f below;

   e.  Estimated amount of total manure (tons) and process wastewater (gallons or acre-inches) transferred to other persons by the facility in the previous 12 months;

   f.  Total number of acres and the Assessor Parcel Numbers for all land application areas covered by the Nutrient Management Plan;

   g.  Total number of acres and the Assessor Parcel Numbers of property that were used for land application of manure and process wastewater in the previous 12 months;

   h.  Summary of all manure and process wastewater discharges from the production area to surface water or to land areas (land application areas or otherwise) when not in accordance with the facility's Nutrient Management Plan that have occurred in the previous 12 months, including date, time, location, approximate volume, a map showing discharge and sample locations, rationale for sample locations, and method of measuring discharge flows;



11/22/06



i.   Summary of all storm water discharges from the production area to surface water in the previous 12 months, including the date, time, approximate volume, duration, location, and a map showing the discharge and sample locations, rationale for sample locations, and method of measuring discharge flows.

j.   Summary of all discharges from the land application area to surface water that have occurred in the previous 12 months, including the date, time, approximate volume, location, source of discharge (i.e., tailwater, process wastewater, or blended process wastewater), a map showing the discharge and sample locations, rationale for sample locations, and method of measuring discharge flows;

k.   A statement indicating if the NMP has been updated and whether the current version of the facility's NMP was developed or approved by a certified nutrient management planner as specified in Attachment C of the Order;

l.   Copies of all manure/process wastewater tracking manifests for the reporting period;

m.   Copies of laboratory analyses of all discharges (manure, process wastewater, or tailwater), surface water (upstream and downstream of a discharge), and storm water, including chain-of-custody forms and laboratory quality assurance/quality control results;

n.   Tabulated analytical data for samples of manure, process wastewater, irrigation water, soil, and plant tissue.  The data shall be tabulated to clearly show sample dates, constituents analyzed, constituent concentrations, and detection limits.

o.   Results of the Record-Keeping Requirements for the production and land application areas specified in Monitoring Provisions A.37.b.ii, A.37.b.iii, A.37.c.i, A.37.c.ii, A.37.c.iii, A.37.c.iv, A.37.c.v, A.37.c.xi, and A.37.c.xiv above.

**Groundwater Reporting**

3.   The Discharger shall report the results of all groundwater monitoring annually by **30 June** each year.  Groundwater monitoring reports shall include all laboratory analyses (including chain-of-custody forms and laboratory quality assurance/quality control results) and tabular and graphical summaries of the monitoring data.  Data shall be tabulated to clearly show the sample dates, constituents analyzed, constituent concentrations, detection limits, depth to groundwater, and groundwater elevations.  Graphical summaries of groundwater gradients and flow directions shall also be included.  Each groundwater monitoring report shall include a summary data table of all historical and current groundwater elevations and analytical results.  The groundwater monitoring reports shall be certified by a California registered

professional as specified in General Reporting Requirements C.9 of the Standard Provisions and Reporting Requirements of the Order.

## Storm Water Reporting

4.  The Discharger shall submit an annual report by **30 June** of each year that details the results of the previous year's storm water monitoring, including the Discharger's preparation for the upcoming wet season for all land application areas.  The annual report shall include a map showing all sample locations for all land application areas, rationale for all sampling locations, a discussion of how storm water flow measurements were made, the results (including the laboratory analyses, chain of custody forms, and laboratory quality assurance/quality control results) of all samples of storm water, a summary of events during the year that contributed pollutants to storm water from any land application area, and any modifications made to the facility or sampling plan in response to pollutants detected in storm water.  The annual report must also include documentation if no significant discharge of storm water occurred from the land application area(s) or if it was not possible to collect any of the required samples or perform visual observations due to adverse climatic conditions.

5.  The first year storm water report shall include an assessment of the storm water monitoring results for any land application area where monitoring was necessary.  If the first year of storm water monitoring for any land application area indicates pollutants have not been detected in storm water samples, the Discharger may propose to the Executive Officer to reduce the constituents and/or sampling frequency for that area.

## General Reporting Requirements

6.  The results of any monitoring conducted more frequently than required at the locations specified herein shall be reported to the Central Valley Water Board.

7.  Laboratory analyses for manure, process wastewater, and soil shall be submitted to the Central Valley Water Board upon request by the Executive Officer.

8.  Each report shall be signed by the Discharger or a duly authorized representative as specified in the General Reporting Requirements C.7 of the Standard Provisions and Reporting Requirements (SPRR), and shall contain the following statement:

    "*I certify under penalty of law that I have personally examined and am familiar with the information submitted in this document and all attachments and that, based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the information is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment.*"

9.    For facilities in Fresno, Kern, Kings, Madera, Mariposa, and Tulare counties, submit
      reports to:

      California Regional Water Quality Control Board
      Central Valley Region
      1685 E Street
      Fresno, CA  93706
      Attention:  Confined Animal Regulatory Unit

      For facilities in Butte, Lassen, Modoc, Plumas, Tehama, and Shasta counties, submit
      reports to:

      California Regional Water Quality Control Board
      Central Valley Region
      415 Knollcrest Drive, Suite 100
      Redding, CA 96002
      Attention:  Confined Animal Regulatory Unit

      For facilities in all other counties, submit reports to:

      California Regional Water Quality Control Board
      Central Valley Region
      11020 Sun Center Drive #200
      Rancho Cordova, CA 95670
      Attention:  Confined Animal Regulatory Unit


                    ORDERED BY:  _____

                                 PAMELA C. CREEDON, Executive Officer


                                 _____
                                               Date

T E N T A T I V E

11/22/06

EXHIBIT 3

Please print or type in the unshaded areas only.

Form Approved. OMB No. 2040-0086.

| FORM | | UNITED STATES ENVIRONMENTAL PROTECTION AGENCY | EPA I.D. NUMBER | | | T/A | C |
|---|---|---|---|---|---|---|---|
| **1** | **♻ EPA** | **GENERAL INFORMATION** | 9 F | | | | D |
| GENERAL | | *Consolidated Permits Program*<br>*(Read the "General Instructions" before starting.)* | 1 2 | | 13 | 14 | 15 |

| LABEL ITEMS | | **GENERAL INSTRUCTIONS** |
|---|---|---|
| I. | EPA I.D. NUMBER | If a preprinted label has been provided, affix it in the designated space. Review the information carefully; if any of it is incorrect, cross through it and enter the correct data in the appropriate fill-in area below. Also, if any of the preprinted data is absent *(the area to the left of the label space lists the information that should appear)*, please provide it in the proper fill-in area(s) below. If the label is complete and correct, you need not complete Items I, III, V, and VI *(except VI-B which must be completed regardless)*. Complete all items if no label has been provided. Refer to the instructions for detailed item descriptions and for the legal authorizations under which this data is collected. |
| III. | FACILITY NAME | |
| V. | FACILITY MAILING ADDRESS | PLEASE PLACE LABEL IN THIS SPACE |
| VI. | FACILITY LOCATION | |

## II. POLLUTANT CHARACTERISTICS

INSTRUCTIONS: Complete A through J to determine whether you need to submit any permit application forms to the EPA. If you answer "yes" to any questions, you must submit this form and the supplemental form listed in the parenthesis following the question. Mark "X" in the box in the third column if the supplemental form is attached. If you answer "no" to each question, you need not submit any of these forms. You may answer "no" if your activity is excluded from permit requirements; see Section C of the instructions. See also, Section D of the instructions for definitions of **bold-faced terms**.

| SPECIFIC QUESTIONS | YES | NO | FORM ATTACHED | SPECIFIC QUESTIONS | YES | NO | FORM ATTACHED |
|---|---|---|---|---|---|---|---|
| A. Is this facility a **publicly owned treatment works** which results in a **discharge** to **waters of the U.S.**? (FORM 2A) | | | | B. Does or will this facility *(either existing or proposed)* include a **concentrated animal feeding operation** or **aquatic animal production facility** which results in a **discharge** to **waters of the U.S.**? (FORM 2B) | | | |
| | 16 | 17 | 18 | | 19 | 20 | 21 |
| C. Is this a facility which currently results in **discharges** to **waters of the U.S.** other than those described in A or B above? (FORM 2C) | | | | D. Is this a proposed facility *(other than those described in A or B above)* which will result in a **discharge** to **waters of the U.S.**? (FORM 2D) | | | |
| | 22 | 23 | 24 | | 25 | 26 | 27 |
| E. Does or will this facility treat, store, or dispose of **hazardous wastes**? (FORM 3) | | | | F. Do you or will you inject at this facility industrial or municipal effluent below the lowermost stratum containing, within one quarter mile of the well bore, underground sources of drinking water? (FORM 4) | | | |
| | 28 | 29 | 30 | | 31 | 32 | 33 |
| G. Do you or will you inject at this facility any produced water or other fluids which are brought to the surface in connection with conventional oil or natural gas production, inject fluids used for enhanced recovery of oil or natural gas, or inject fluids for storage of liquid hydrocarbons? (FORM 4) | | | | H. Do you or will you inject at this facility fluids for special processes such as mining of sulfur by the Frasch process, solution mining of minerals, in situ combustion of fossil fuel, or recovery of geothermal energy? (FORM 4) | | | |
| | 34 | 35 | 36 | | 37 | 38 | 39 |
| I. Is this facility a proposed **stationary source** which is one of the 28 industrial categories listed in the instructions and which will potentially emit 100 tons per year of any air pollutant regulated under the Clean Air Act and may affect or be located in an attainment area? (FORM 5) | | | | J. Is this a proposed **stationary source** which is NOT one of the 28 industrial categories listed in the instructions and which will potentially emit 250 tons per year of any air pollutant regulated under the Clean Air Act and may affect or be located in an **attainment area**? (FORM 5) | | | |
| | 40 | 41 | 42 | | 43 | 44 | 45 |

## III. NAME OF FACILITY

| C 1 | SKIP | | |
|---|---|---|---|
| 15 | 16 – 29 | 30 | 69 |

## IV. FACILITY CONTACT

| | A. NAME & TITLE *(last, first, & title)* | B. PHONE *(area code & no.)* |
|---|---|---|
| C 2 | | |
| 15 | 16                                            45 | 46   48 49   51 52-   55 |

## V. FACILITY MAILING ADDRESS

| | A. STREET OR P.O. BOX |
|---|---|
| C 3 | |
| 15 | 16                                            45 |

| | B. CITY OR TOWN | C. STATE | D. ZIP CODE |
|---|---|---|---|
| C 4 | | | |
| 15 | 16                     40 | 41  42 | 47            51 |

## VI. FACILITY LOCATION

| | A. STREET, ROUTE NO. OR OTHER SPECIFIC IDENTIFIER |
|---|---|
| C 5 | |
| 15 | 16                                            45 |

| | B. COUNTY NAME |
|---|---|
| | |
| 46 | 70 |

| | C. CITY OR TOWN | D. STATE | E. ZIP CODE | F. COUNTY CODE *(if known)* |
|---|---|---|---|---|
| C 6 | | | | |
| 15 | 16                  40 | 41  42 | 47        51 | 52        -54 |

EPA Form 3510-1 (8-90)                                                                                     CONTINUE ON REVERSE

Case 2:07-cv-01452-DLB   Document 17   Filed 04/25/07   Page 71 of 74

## VII. SIC CODES *(4-digit, in order of priority)*

### A. FIRST
C
7
15  16  -  19

### B. SECOND
C
7
15  16  -  19

### C. THIRD
C
7
15  16  -  19

### D. FOURTH
C
7
15  16  -  19

## VIII. OPERATOR INFORMATION

### A. NAME
C
8
15  16

**B.** Is the name listed in Item VIII-A also the owner?
☐ YES ☐ NO
55  66

### C. STATUS OF OPERATOR *(Enter the appropriate letter into the answer box: if "Other," specify.)*

F = FEDERAL
S = STATE
P = PRIVATE

M = PUBLIC *(other than federal or state)*
O = OTHER *(specify)*
56

### D. PHONE *(area code & no.)*
A
15  16  -  18  19  -  21  22  -  26

### E. STREET OR P.O. BOX
26                                                                55

### F. CITY OR TOWN
C
B
15  16                                                40

### G. STATE
41        42

### H. ZIP CODE
47  -  51

### IX. INDIAN LAND
Is the facility located on Indian lands?
☐ YES          ☐ NO
52

## X. EXISTING ENVIRONMENTAL PERMITS

### A. NPDES *(Discharges to Surface Water)*
C  T  I
9  N
15  16  17  18                              30

### D. PSD *(Air Emissions from Proposed Sources)*
C  T  I
9  P
15  16  17  18                              30

### B. UIC *(Underground Injection of Fluids)*
C  T  I
9  U
15  16  17  18                              30

### E. OTHER *(specify)*
C  T  I
9
15  16  17  18                              30

### C. RCRA *(Hazardous Wastes)*
C  T  I
9  R
15  16  17  18                              30

### E. OTHER *(specify)*
C  T  I
9
15  16  17  18                              30

## XI. MAP

Attach to this application a topographic map of the area extending to at least one mile beyond property boundaries. The map must show the outline of the facility, the location of each of its existing and proposed intake and discharge structures, each of its hazardous waste treatment, storage, or disposal facilities, and each well where it injects fluids underground. Include all springs, rivers, and other surface water bodies in the map area. See instructions for precise requirements.

## XII. NATURE OF BUSINESS *(provide a brief description)*

## XIII. CERTIFICATION *(see instructions)*

*I certify under penalty of law that I have personally examined and am familiar with the information submitted in this application and all attachments and that, based on my inquiry of those persons immediately responsible for obtaining the information contained in the application, I believe that the information is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment.*

### A. NAME & OFFICIAL TITLE *(type or print)*

### B. SIGNATURE

### C. DATE SIGNED

## COMMENTS FOR OFFICIAL USE ONLY
C
C
15  16                                                55

EPA Form 3510-1 (8-90)

Form Approved
OMB No. 2040-0250
Approval expires 12-15-05

| EPA I.D. NUMBER *(copy from Item 1 of Form 1)* |
|---|

| FORM **2B** NPDES | **EPA** | U.S. ENVIRONMENTAL PROTECTION AGENCY APPLICATIONS FOR PERMIT TO DISCHARGE WASTEWATER CONCENTRATED ANIMAL FEEDING OPERATIONS AND AQUATIC ANIMAL PRODUCTION FACILITIES |
|---|---|---|

**I.  GENERAL INFORMATION**      Applying for:    Individual Permit   ☐      Coverage Under General Permit   ☐

| A. TYPE OF BUSINESS | B. CONTACT INFORMATION | C. FACILITY OPERATION STATUS |
|---|---|---|
| ☐ 1. Concentrated Animal Feeding Operation (complete items B, C, D, and Section II)<br><br>☐ 2. Concentrated Aquatic Animal Production Facility (complete items B, C, and section III) | Owner/or Operator Name:<br>Telephone: (       )<br>Address: _____<br>Facsimile: ( _____ ) _____<br>City: _____ State:_____ Zip Code: _____ | ☐ 1. Existing Facility<br><br>☐ 2. Proposed Facility |

**D.  FACILITY INFORMATION**

Name:                                  Telephone: (       )
Address:                           Facsimile: (       )
City:                State:            Zip Code:
County: _____ Latitude: _____ Longitude: _____

If contract operation:  Name of Integrator:
                  Address of Integrator:

**II.  CONCENTRATED ANIMAL FEEDING OPERATION CHARACTERISTICS**

| A. TYPE AND NUMBER OF ANIMALS | | | B. Manure, Litter and/or Wastewater Production and Use |
|---|---|---|---|
| | **2. ANIMALS** | | a) How much manure, litter and wastewater is generated annually by the facility? _____ tons _____ gallons |
| 1.  TYPE | NO. IN OPEN CONFINEMENT | NO. HOUSED UNDER ROOF | b) If land applied how many acres of land under the control of the applicant are available for applying the CAFOs manure/litter/wastewater? _____ acres |
| ☐ Mature Dairy Cows | | | c) How many tons of manure or litter, or gallons of waste-water produced by the CAFO will be transferred annually to other persons? tons/gallons *(circle one)* _____ tons |
| ☐ Dairy Heifers | | | |
| ☐ Veal Calves | | | |
| ☐ Cattle (not dairy or veal) | | | |
| ☐ Swine (55 lbs. or over) | | | |
| ☐ Swine (under 55 lbs.) | | | |
| ☐ Horses | | | |
| ☐ Sheep or Lambs | | | |
| ☐ Turkeys | | | |

Form Approved
OMB No. 2040-0250
Approval expires 12-15-05

| | | |
|---|---|---|
| ❑ Chickens (Broilers) | | |
| ❑ Chickens (Layers) | | |
| ❑ Ducks | | |
| ❑ Other<br>Specify | | |
| 3.  TOTAL ANIMALS | | |

C. ❑  TOPOGRAPHIC MAP

D.  TYPE OF CONTAINMENT, STORAGE AND CAPACITY

| 1.  Type of Containment | Total Capacity (in gallons) |
|---|---|
| ❑      Lagoon | |
| ❑      Holding Pond | |
| ❑      Evaporation Pond | |
| ❑      Other: Specify _____ | |

| 2.  Report the total number of acres contributing drainage: | acres |
|---|---|

| 3.  Type of Storage | Total Number of Days | Total Capacity (gallons/tons) |
|---|---|---|
| ❑      Anaerobic Lagoon | | |
| ❑      Storage Lagoon | | |
| ❑      Evaporation Pond | | |
| ❑      Aboveground Storage Tanks | | |
| ❑      Belowground Storage Tanks | | |
| ❑      Roofed Storage Shed | | |
| ❑      Concrete Pad | | |
| ❑      Impervious Soil Pad | | |
| ❑      Other: Specify | | |

E.  NUTRIENT MANAGEMENT PLAN

A. Has a nutrient management plan been developed?      ❑ Yes      ❑ No

B. Is a nutrient management plan being implemented for the facility?      ❑ Yes      ❑ No

C. If no, when will the nutrient management plan be developed?  Date: _____

D. The date of the last review or revision of the nutrient management plan.  Date:

E. If not land applying, describe alternative use(s) of manure, litter and or wastewater:

Form Approved
OMB No. 2040-0250
Approval expires 12-15-05

F.  LAND APPLICATION BEST MANAGEMENT PRACTICES
Please check any of the following best management practices that are being implemented at the facility to control runoff and protect water quality:

❑ Buffers   ❑ Setbacks   ❑ Conservation tillage   ❑ Constructed wetlands   ❑ Infiltration field   ❑ Grass filter   ❑ Terrace

## III. CONCENTRATED AQUATIC ANIMAL PRODUCTION FACILITY CHARACTERISTICS

| A.  For each outfall give the maximum daily flow, maximum 30-day flow, and the long-term average flow. | | | | B.  Indicate the total number of ponds, raceways, and similar structures in your facility. | | |
|---|---|---|---|---|---|---|
| 1  Outfall No | 2.  Flow (*gallons per day*) | | | 1.  Ponds | 2.  Raceways | 3.  Other |
| | a. Maximum Daily | b. Maximum 30 Day | c. Long Term Average | C.  Provide the name of the receiving water and the source of water used by your facility. | | |
| | | | | 1  Receiving Water | 2.  Water Source | |

D.  List the species of fish or aquatic animals held and fed at your facility. For each species, give the total weight produced by your facility per year in pounds of harvestable weight, and also give the maximum weight present at any one time.

| 1. Cold Water Species | | | 2. Warm Water Species | | |
|---|---|---|---|---|---|
| a. Species | b. Harvestable Weight (*pounds*) | | a. Species | b. Harvestable Weight (*pounds*) | |
| | (1) Total Yearly | (2) Maximum | | (1) Total Yearly | (2) Maximum |
| | | | | | |

| E.  Report the total pounds of food during the calendar month of maximum feeding. | 1. Month | 2. Pounds of Food |
|---|---|---|
| | | |

## IV. CERTIFICATION

*I certify under penalty of law that I have personally examined and am familiar with the information submitted in this application and all attachments and that, based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the information is true accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment.*

| A.  Name and Official Title (*print or type*) | B.  Phone No. (     ) |
|---|---|
| C.  Signature | D.  Date Signed |